## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Brian D. Murphy, individually and on behalf of other similarly situated current and former homeowners in Pennsylvania,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Bank of America, N.A.; the Bank of New York Mellon, N.A., as trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11; McCabe, Weisberg & Conway, P.C.; Terrance J. McCabe; Marc S. Weisberg; Edward D. Conway; QBE Insurance Corporation; and, QBE First Insurance Agency, Inc.<br><br>                  Defendants. | Civil Action #_____<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Brian D. Murphy ("Plaintiff" or "Mr. Murphy") brings this class action on behalf of himself and all others similarly situated against Bank of America, N.A.; the Bank of New York Mellon, N.A., as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11; McCabe, Weisberg & Conway, P.C.; Terrance J. McCabe; Marc S. Weisberg; Edward D. Conway, QBE Insurance Corporation; and, QBE First Insurance Agency, Inc. This is a consumer Class Action Complaint filed on behalf of Pennsylvania homeowners challenging, *inter alia*, systematic practices in demanding contractually unauthorized and/or illegal foreclosure-related attorneys' fees. This Class Action Complaint also asserts claims arising out of unauthorized and/or illegal conduct relating to force-placed insurance premiums that have been charged to Mr. Murphy and other homeowners that increased their debt and that constituted liens on their property. As is set forth below, Defendants are liable to Mr. Murphy

and other homeowners under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et. seq.*; the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.*; the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*; the Pennsylvania Loan Interest and Protection Law ("Act 6"), 41 P.S. §§ 101, *et seq.*; the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 *et. seq.*; and, under the common law causes of action set forth below.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), in that this is a putative class action where members of the proposed class are citizens of a state different from any of the defendants, and the amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  In addition, jurisdiction over the federal causes of action (Counts I, II, V, VIII and IX) exists under 28 U.S.C. § 1331; jurisdiction over Counts I and II exists under RICO, 18 U.S.C. § 1964(c); jurisdiction over Count V exists under the FDCPA, 15 U.S.C. § 1692k(d); jurisdiction over Count VIII exists under RESPA, 12 U.S.C. § 2614; and jurisdiction over Count IX exists under TILA, 15 U.S.C. § 1640(e).  Supplemental jurisdiction over the state law claims (Counts III, IV, VI, VII, X, XI, XII, XIII and XIV) exists under 28 U.S.C. § 1367.

2. Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (2) because (i) one or more of the Defendants reside in this District and all Defendants reside in this State, and (ii) a substantial part of the events and omissions giving rise to the claims set forth herein occurred in this District.

## THE PARTIES

3.    Plaintiff, Brian D. Murphy, is a natural person residing at 85 Short Street, Blairsville, Pennsylvania 15717.  Mr. Murphy brings this action on his own behalf and on behalf of similarly situated homeowners whose properties are located in Pennsylvania.

4.    Defendant, Bank of America, N.A. ("BOA"), is a national bank with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28202.  During the period of time relevant to the claims set forth herein, BOA was the servicer of Mr. Murphy's Mortgage.[1]  BOA also is the legal successor to Countrywide Home Loans, Inc., and Countrywide Home Loans Servicing, LP, both of which have represented themselves to be the lender in connection with Mr. Murphy's Mortgage.  Servicers almost always retain foreclosure debt collecting counsel on behalf of the foreclosing lender and BOA retained MWC to file the foreclosure complaints against Mr. Murphy on behalf of BNY Mellon, as discussed below.

5.    Defendant, the Bank of New York Mellon ("BNY Mellon"), as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11, is a national bank with its principal place of business at 101 Barclay Street, 4W, New York, New York 10286.  BNY Mellon is the purported mortgagee of Mr. Murphy's Mortgage.

6.    Defendant, McCabe, Weisberg and Conway, P.C. ("MWC"), is a professional corporation with its principal office located in this District  at 123 South Broad Street, Suite 1400, Philadelphia, Pennsylvania 19109.   As debt collecting counsel, MWC filed two Foreclosure Complaints against Mr. Murphy, as set forth below.  It is believed, and therefore averred, that there are written retainer agreements between BOA and MWC.

7.    Defendant, Terrance J. McCabe, is an individual and Pennsylvania-licensed attorney.

---

[1] "Servicer" means the entity responsible for the servicing of a mortgage loan, including the entity that makes or holds a mortgage loan if such entity also services the mortgage.  12 C.F.R. § 1024.2.

He is a founding shareholder, managing President and a partner of MWC.

8. Defendant, Marc S. Weisberg, is an individual and Pennsylvania-licensed attorney. He is a founding shareholder, managing Vice President and a partner of MWC.

9. Defendant, Edward D. Conway, is an individual and Pennsylvania-licensed attorney. He is also a founding shareholder, managing Secretary and a partner of MWC.

10. Defendant, QBE Insurance Corporation ("QBE Insurance"), is a Pennsylvania corporation with a principal place of business located at 88 Pine Street, 16th Floor, New York, New York 10005. QBE Insurance is one of the largest insurance companies in the United States involved in the issuance of "force-placed" insurance.

11. Defendant, QBE First Insurance Agency ("QBE First"), is a Pennsylvania corporation with a principal place of business located at 210 Interstate North Parkway, Atlanta, Georgia 30339. On information and belief, QBE First is an insurance agency that was used as a conduit in paying kickbacks (in the form of commissions or other improper payments) to Defendants BNY Mellon and/or BOA (or one of their successor servicers) as part of the force-placed insurance scheme described herein.

## OTHER PERSONS AND ENTITIES

12. Non-party Countrywide Home Loans, Inc. ("Countrywide") is a failed financial institution that was acquired by BOA in 2008 during the Financial Institutions Reform, Recovery, and Enforcement Act. After BOA's acquisition of Countrywide, Countrywide was renamed Bank of America Home Loans ("BAC Home Loans"). BAC Home Loans was a wholly-owned subsidiary of BOA until 2011, when it was merged into BOA.

13. Non-party Countrywide Home Loans Servicing, LP changed its name to BAC Home Loans Servicing, LP and was merged into BOA in 2011.

14.    Non-party Mortgage Electronic Registration System ("MERS") is a mortgage electronic registration system, and a company sponsored and instituted by mortgage companies. MERS was the nominee for Countrywide and Countrywide's successors and assigns.   As nominee-mortgagee, it was authorized to act as the mortgagee.

## FACTUAL BACKGROUND

### A.  *Mr. Murphy's Financing of His Home and the Multiple Purported Assignments of His Mortgage*

15.    In May 2006, Mr. Murphy purchased his home, located at 85 Short Street, Blairsville, Pennsylvania.  In connection with the purchase, Mr. Murphy financed the principal amount of $53,200.00 from Countrywide and granted a Mortgage (the "Mortgage") to Countrywide and/or MERS, as nominee for Countrywide.  The Mortgage was recorded in the Office of the Recorder of Indiana County in Mortgage Book 1650, Page 700.  A copy of the Mortgage is attached hereto as Exhibit A.  A copy of Mr. Murphy's Note at the time of his closing is attached hereto as Exhibit B.

16.    The Mortgage purported to authorize Countrywide to sell the Note and Mortgage, and purported to authorize a separate transfer of the servicing rights.[2]  Mortgage, ¶ 20, which, *inter alia*, provides:

> **Sale of Note; Change of Loan Servicer; Notice of Grievance**.
> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity

---

[2] "Servicing" means:
> receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including amounts for escrow accounts under section 10 of RESPA (12 U.S.C. § 2609), and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract.

See 12 C.F.R. § 1024.2.

(known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

17.    Where, as here, the servicing right terms of the Mortgage are separated from the Note, the sale or transfer of the Note is known as a "servicing-retained" basis.

18.    Soon after closing, Countrywide packaged Mr. Murphy's Note with a larger pool of notes, which were then transferred on a servicing-retained basis to Bank of New York (predecessor of defendant Bank of New York Mellon), as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11.

19.    Through an Assignment of Mortgage with a purported effective date of September 26, 2007, MERS purported to assign its interest in the Mortgage to BNY Mellon as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11.    The Assignment was backdated.  Despite reflecting a purported effective date of September 26, 2007, the signature of the officer of MERS who executed the Assignment is dated October 9, 2007, and the Assignment was not filed with the Office of the Recorder of Indiana County until October 19, 2007.  See Exhibit C, attached hereto.  The 2007 Assignment was signed on behalf of MERS by M. Kelly Richie, who identified himself as a "1st Vice President" of MERS.

20.    Despite the fact that it supposedly had assigned the Mortgage to BNY Mellon in 2007, MERS purported to assign the Mortgage to BNY Mellon a second time, in February 2012.  The 2012 Assignment was filed with the Office of the Recorder of Indiana County on March 8, 2012. See Exhibit D, attached hereto.

21.    The second Assignment also purported to assign Mr. Murphy's Note to BNY Mellon. This second Assignment was the first purported actual Assignment of the Note from

Countrywide to BNY Mellon.  Countrywide, however, no longer existed at the time of the purported second Assignment.

### B.  Relevant Mortgage Terms Regarding Foreclosure-Related Attorneys' Fees

22.  Neither law firm MWC nor servicer BOA was authorized under the Mortgage contract to charge and/or collect foreclosure-related attorneys' fees.  <u>See</u> Exhibit A, ¶¶ 9 and 22.

23.  Mr. Murphy's Mortgage contract authorizes, *inter alia*, the lender, in instances of default, to charge the homeowner only for attorneys' fees for services actually performed (*i.e.*, incurred) in connection with that default.  Mortgage, ¶ 22, which in relevant part provides:

> Lender shall be entitled to collect all expenses <u>incurred in pursuing the remedies provided in this Section 22</u>, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.  (Emphasis added)

24.  The foreclosure-related attorneys' fees itemized in the foreclosure complaints filed by MWC on behalf of BNY Mellon described below were not actually incurred in the amounts demanded in the complaints and, therefore, were not authorized by the Mortgage.  Yet those fees were charged to and liened against Mr. Murphy's and other homeowners' properties.

25.  In the context of foreclosure-related attorneys' fees, the Mortgage only authorizes the collection of charges incurred.  Mortgage, ¶ 22, quoted above.

26.  Neither BNY Mellon nor BOA was contractually authorized to charge and/or collect foreclosure-related attorneys' fees before the fee was actually incurred or before MWC performed such legal services.  Mortgage, ¶ 22, quoted above.

27.  Neither BNY Mellon nor BOA was contractually authorized to charge and/or collect foreclosure-related attorneys' fees that were unreasonable as determined by method, *i.e.*, fees charged on a percentage or fixed fee basis instead of an hourly rate method.  Exhibit A, ¶ 9.

28.  The attorneys' fees and foreclosure-related expenses charged to Mr. Murphy and other

homeowners were not authorized by the mortgages and/or were illegal under statutory law, resulting in Mr. Murphy and other homeowners paying and/or being assessed charges on inflated principal balances or on their debt.

29.   The foreclosure-related attorneys' fee provisions cited above are standard terms found in virtually all residential mortgages.

### C. Bank of New York Mellon's Multiple Foreclosure Actions

30.   On September 28, 2007, Bank of New York, as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11, through its agent and debt collector defendant MWC, filed a foreclosure action against Mr. Murphy, alleging that Mr. Murphy was in default under his loan and that a total of $59,536.46 was due and payable to Bank of New York. Of this amount, the principal balance that was owed was alleged to be $53,062.59; the remaining balance of approximately $6,500 consisted of interest ($2,842.98) and attorneys' fees ($2,653.13), as well as other fee and charges, including for late charges, corporate advance, escrow advance and title search.  This first foreclosure action was docketed in the Court of Common Pleas of Indiana County at No. 11805 CD 2007.  The foreclosure Complaint filed in the first foreclosure action purported to be verified by Shannon Nicole Varner, identified as an Assistant Vice President of BOA.  See Exhibit E, attached hereto.

31.   The foreclosure Complaint filed by Bank of New York in the first foreclosure action alleged that the Mortgage had been assigned by MERS to Bank of New York as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11, and that the Assignment would be recorded in the future in the Indiana County Office of the Recorder.

32.   The foreclosure Complaint filed in the first foreclosure action failed to indicate the date on which the demanded amounts, as set forth above, became due and owing.

33.   On November 9, 2007, in the first foreclosure action, Bank of New York through its

agent, Defendant MWC, had a default judgment entered against Mr. Murphy in the amount of $60,387.42, plus costs and interest. This amount consisted of the charges described above, as well as $850.96 of additional interest that allegedly had accrued during the period from September 26, 2007 to November 8, 2007. Bank of New York through its agent and debt collector MWC had a Writ of Execution issued with respect to the default judgment on or about November 16, 2007, and proceeded to have a Sheriff's sale scheduled to occur with respect to Mr. Murphy's home.

34.    On or about November 4, 2008 Countrywide Servicing sent Mr. Murphy a document that purported to be an Act 91 Notice, *i.e.*, a notice required as a prerequisite to foreclosure by the Housing Finance Agency Law ("Act 91"), 35 P.S. § 1680.403c. See Exhibit F, attached hereto. The Notice falsely identified Countrywide Servicing as both the lender and servicer of Mr. Murphy's loan. The Notice further represented that as of the date of the Notice there was a past due amount of $3,566.05 owed to Countrywide Servicing.

35.    No further notices purporting to be notices under Act 91 were sent to Mr. Murphy and at no point did defendant Bank of New York Mellon send an Act 91 notice to Mr. Murphy. Under the terms of the Housing Finance Agency Law ("Act 91"), 35 P.S. § 1680.403c, mortgage holders considering foreclosure are required to send homeowners a notice meeting specific statutory requirements as a prerequisite to initiating any legal action.

36.    These statutory notification requirements at all relevant times included, *inter alia*, requirements that the homeowner receive an accurate, itemized breakdown of the total amount past due as of the date of the notice; that the homeowner be informed that he/she is entitled to thirty-three (33) days to have a face-to-face meeting with a consumer credit counseling agency; and that the homeowner be made aware she can apply for financial assistance under the state-

funded Homeowner's Emergency Mortgage Assistance Program ("HEMAP").

37.   The notice that Countrywide Servicing sent to Mr. Murphy in November 2008 failed to satisfy the Act 91 requirements in several important respects.  First, the notice misrepresented the outstanding amount due and owing.  An Act 91 notice, to be valid, must provide an accurate default amount due as of the date of mailing so as to enable the homeowner to make good on the pre-acceleration arrearage.

38.   Second, the notice failed to accurately state, and misrepresented, the number of months for which Mr. Murphy's payments were in arrears.  The Notice recited that "YOU HAVE NOT MADE MONTHLY MORTGAGE PAYMENTS for the following months and the following amounts are now past due," but then referred only to "8/1/2008" as the only date for which "Monthly Charges" allegedly were owed.

39.   Third, the purported Act 91 notice misrepresented the amount of time Mr. Murphy had to request a meeting with a consumer credit counseling agency.  Countrywide Servicing informed Mr. Murphy that he had thirty (30) days to meet with a credit counseling agency, as opposed to the thirty-three (33) days to which he was entitled by statute.  35 P.S. § 1680.403c.

40.   Fourth, Countrywide Servicing also threatened to initiate legal action if Mr. Murphy did not pay the amount claimed to be owed within thirty days.  As noted, no legal action may be initiated unless and until (1) the mortgagee sends the homeowner a notice meeting the statutory requirements of Act 91, and (2) at least thirty-three (33) days pass without the homeowner applying for financial assistance from HEMAP.  If a homeowner does apply for assistance through HEMAP, the lender is unable to initiate any legal action for an even longer period to allow for the application for assistance to be processed.

41.   Because Countrywide Servicing did not send Mr. Murphy a notice complying with the

provisions of Act 91, its threat to initiate legal action could not lawfully have been taken.

42.   On April 16, 2012, BNY Mellon, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-11, filed a Complaint in Mortgage Foreclosure (the "Second Foreclosure Complaint") against Mr. Murphy in Indiana County, Pennsylvania through its agent and debt collector, MWC.  The Complaint was docketed at Case No. 10664 CD 2012.

43.   The Second Foreclosure Complaint filed on behalf of BNY Mellon was verified by Shannon Nicole Varner, Assistant Vice-President of defendant BOA.

44.   The Second Foreclosure Complaint demanded a total of $102,157.77, itemized as follows (without identifying the date on which these amounts allegedly were due):

| | |
|---|---:|
| Unpaid Principal Balance | $65,014.83 |
| Accumulated Interest (7/1/08 – 2/27/12 | 31,183.48 |
| Accumulated Late Charges | 149.16 |
| Attorney's Fee | 1,450.00 |
| Corporate Advance | 675.00 |
| Escrow Advance | 3,685.00 |
| Total | $102,157.77 |

45.   The Second Foreclosure Complaint failed to provide any support that the demanded expenses and fees were incurred.  As of April 16, 2012, BNY Mellon had not incurred foreclosure-related attorneys' fees, as charged to Mr. Murphy, for the legal services allegedly charged, and the attorneys' fees were not due or owing as of April 16, 2012.

46.   With respect to attorneys' fees, 41 P.S. § 406 ("Act 6") limits the attorneys' fees that can be charged to residential mortgage debtors to fees that are "reasonable and actually incurred."    In addition, attorneys' fees and legal expenses prior to the commencement of a foreclosure complaint may not exceed $50.  41 P.S. § 406(3).  Despite these expressstatutory prohibitions, the complaint demanded a flat amount of $1,450.00 in attorneys' fees.  Not only is this sum not alleged to reflect work MWC performed, but there is no indication that BNY

Mellon ever paid such alleged fees before being charged to Mr. Murphy.

47.   The attorneys' fees demanded in the Second Foreclosure Complaint were not based on legal services incurred and invoiced by MWC or that BNY Mellon or BOA actually incurred as of April 16, 2012.

48.   The Second Foreclosure Complaint demanded attorneys' fees from Mr. Murphy that were misleading and/or deceptive because the amounts were unincurred.  The lien wrongfully caused a diminution in the value of Mr. Murphy's home.  Mr. Murphy has suffered deprivation of property equal to the inflated attorneys' fees liened against, and encumbering, Mr. Murphy's home.

49.   For these reasons, Mr. Murphy's current account balance (payoff amount) was overstated upon the filing of the foreclosure complaint.  Currently, it reflects paid (or liened) and unpaid foreclosure-related fees and legal expenses.

### D. A Prothonotary in Pennsylvania Lacks the Judicial Power to Enter Judgment on an Unliquidated Award

50.   MWC, BNY Mellon and BOA also collected foreclosure-related attorneys' fees, in fixed amounts not yet incurred, from class members after the entry of final foreclosure judgments that consisted of unliquidated, as opposed to liquidated, amounts.  Such unliquidated amounts cannot be determined by the Prothonotary or its Deputy.  See Pa.R.Civ.P. 1037(b)(1), which provides:

> The prothonotary shall assess damages for the amount to which the plaintiff is entitled if it is a sum certain or which can be made certain by computation, but if it is not, the damages shall be assessed at a trial at which the issues shall be limited to the amount of the damages.

51.   A Prothonotary in Pennsylvania lacks the judicial power to enter a monetary judgment for unliquidated damages absent express direction from an Article V court.  The Prothonotary is

only empowered to enter a default judgment for liquidated damages of a "sum certain or which can be made certain by computation." Id.

### E. Illegal and Abusive Force-Placed Insurance Practices, Including the Payment of Kickbacks to BOA

52.   Under the terms of the Mortgages of Mr. Murphy and the members of the Force-Placed Insurance Class (as defined below), Mr. Murphy and the members of the Class agreed to maintain property insurance on the improvements on the property securing the mortgages. Mortgage, ¶ 5 (Exhibit A).  In the event that such insurance was not maintained, the lender was entitled to "obtain insurance coverage, at Lender's option and Borrower's expense." Id.

53.   During certain periods of time, including from May 16, 2013 through the present, Mr. Murphy did not arrange for property insurance on his residence.  As a result, BOA obtained coverage.  BOA abused its right to obtain coverage protecting its interest in the property by obtaining unauthorized coverage and charging Mr. Murphy force-placed insurance premiums that included undisclosed kickbacks (in the form of commissions or other improper payments) that were paid to BOA and/or its affiliates.

54.   By Notice dated May 21, 2013, BOA advised Mr. Murphy that it had arranged for the issuance of "Lender-Placed Hazard Insurance" (i.e., force-placed insurance) with respect to Mr. Murphy's residence.  Exhibit G, attached hereto.  The Notice stated that the insurance was purchased "at your expense in the amount of $1,108." Id.  This exorbitant cost was based on an excessive amount of coverage -- $132,000.00 – which BOA falsely represented in its Notice to be "[t]he coverage amount of lender-placed insurance coverage we obtained last year." Id.

55.   In May 2013, defendant QBE Insurance issued an "Additional Named Insured Certificate" to Mr. Murphy, reflecting that force-placed coverage had been placed in favor of BOA (identified as the "NAMED INSURED MORTGAGEE") in the amount of $132,000.00,

for the period May 16, 2013 to May 16, 2014, with Mr. Murphy identified as an additional insured.  Exhibit H.

56.    A factor resulting in the exorbitant premium charged to Mr. Murphy's account balance was the inclusion in the premium of kickbacks (in the form of commissions or other improper payments) that QBE and BOA(or their affiliates) had agreed would be paid to BOA (or one of its affiliates).

57.    Although Defendants did not disclose the existence of any kickbacks paid in connection with the issuance of force-placed insurance to Mr. Murphy or other borrowers, Mr. Murphy has reasonable grounds to believe that QBE in fact paid such kickbacks to BOA (and/or its affiliates), based on public reports concerning the force-placed related business practices of QBE and the mortgagees and servicers for which it issues force-placed insurance.  See New York Department of Financial Services ("DFS") Press Releases dated April 18, 2013 and May 30, 2013 (Exhibits I and J, attached hereto).  For example, the April 18, 2013 Press Release discusses a settlement reached with QBE that included a $10 million penalty and stated:

> DFS's investigation revealed that QBE competed for business from the banks and mortgage servicers through what is known as "reverse competition."  That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits.  This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums.  That's because the higher the premiums, the more that the insurers paid to the banks.
>
> In some cases, QBE paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers.  Typically, the commissions are ten to twenty percent of the premium written on the servicer's mortgage loan portfolio.  The evidence from the Investigation indicates that the affiliated agencies and brokers do little or no work for the commissions QBE had paid them.

Exhibit I.  New York Governor Andrew M. Cuomo is quoted as follows:  "The kickbacks and payoffs in the force-placed insurance industry used to be a dirty little secret that pushed far too many families off the foreclosure cliff, but my Administration's investigation is helping put a stop to those abuses."  Id.  See also May 30, 2013 DFS Press Release (Exhibit J), referring to a "troubling web of kick-backs and payoffs at certain force-placed insurers."

58.   The force-placed insurance premiums charged to Mr. Murphy and members of the Force-Placed Insurance Class (as defined below) were charged to Mr. Murphy and such class members in the full amount of the premiums (*i.e.*, including the amounts that were kicked-back) and resulted in increases in the liens encumbering their residences.  These charges, and in turn the amounts liened against Mr. Murphy and members of the Force-Placed Insurance Class, resulted in direct property loss to Mr. Murphy and such class members.

59.   Rather than use force-placed insurance for the legitimate purpose of protecting the mortgagee's interest in the collateral for Mr. Murphy's and homeowners' Mortgages, BOA used its power to force-place coverage in such a manner, and in such amounts, to gain unwarranted monetary gains at the expense of Mr. Murphy and members of the Force-Placed Insurance Class. Through the "reverse competition" process described in the April 18, 2013 DFS Press Release (Exhibit I), the lender or servicer chooses the coverage provider and amount of coverage, with the consumer purportedly obligated to pay for the cost of the coverage and with the lender and servicer not only having no incentive to select the lowest-priced coverage but actually having financial incentives, as described herein, to obtain excessive and unwarranted coverage at inflated premiums.

60.   As a result of its arrangements and understandings with QBE (and/or affiliates thereof) related to the payment and receipt of illegal kickbacks, BOA had strong financial incentives to

force-place as much insurance as possible and to inflate the amount of coverage provided, as the amount of illegal kickbacks received by BOA and/or its affiliates was based on the amount of force-placed insurance premiums charged to Mr. Murphy and members of the Force-Placed Insurance Class.

## **CLASS ALLEGATIONS**

61.   This Complaint is filed on behalf of Mr. Murphy and the following two classes under Fed.R.Civ.P. 23(b)(2) and 23(b)(3) classes (referred to collectively as the "Classes"):

a.   The Foreclosure Class:  Former or current homeowners who obtained financing secured by a first mortgage on residential property located within the Commonwealth of Pennsylvania, where MWC caused a foreclosure complaint to be filed against such homeowners, and where BOA was a servicer for all or part of the time period within six years prior to the filing of this Complaint; and

b.   The Force-Placed Insurance Class:  Homeowners who obtained financing secured by a first mortgage on residential property located within the Commonwealth of Pennsylvania that was serviced by BOA, and who were charged for force-placed insurance coverage issued by QBE Insurance within six years of the filing of this Complaint (the "Force-Placed Insurance Class").

### *A.  Numerosity*

62.   Each of the Classes is so numerous that it is impracticable to bring all members thereof before the Court.  The exact number of homeowners in each class is unknown, but is believed to be over 5,000.  The exact number can be determined from Defendants' records.

### *B.  Commonality and Predominance*

63.   There are questions of law and fact that are common to the Classes and that predominate over any issues affecting only individual members.  Fed.R.Civ.P. 23(a)(2), (b)(3).

Without limitation, the focus of the litigation will be Defendants' uniform conduct and procedures, including their standardized billing practices with respect to their Pennsylvania foreclosure cases, forced placement of insurance, MWC's uniform demands for foreclosure-related attorneys' fees and collection procedures, and the practices of BOA, QBE Insurance and QBE First with respect to the imposition of force-placed insurance and the payment and receipt of kickbacks in the form of commissions or other improper payments.

### C. Typicality

64.     Mr. Murphy's claims are identical, or at least typical, to the claims of each of the Classes.   Mr. Murphy and the class of homeowners he represents have sustained virtually identical types of damages, have been subjected to identical illegal foreclosure-related collection attempts, have been subjected to identical conduct and practices with respect to force-placed insurance, and their claims are based on identical contractual and statutory legal theories. Damages can be mechanically and mathematically determined from business records maintained by Defendants.  Fed.R.Civ.P. 23(a)(3).

### D. Adequacy of Representation

65.     Mr. Murphy is an adequate class representative because his interests coincide with, and are not antagonistic to, the interests of each of the Classes.   Furthermore, class counsel is competent and experienced in such litigation.  Fed.R.Civ.P. 23(a)(4).

### E. Superiority

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Fed.R.Civ.P. 23(b)(3).  The damages sought by Mr. Murphy and each of the members of the Classes are such that individual prosecution would prove burdensome and expensive, given the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the class to individually

redress the wrongs done to them in an economic and effective manner. Many, if not most, of the members of the Classes are unaware of their rights under their mortgage contracts and of their foreclosure rights under federal and state law. Even if the members themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system given the complex legal and factual issues raised by Defendants' conduct related to foreclosures and force-placed insurance. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

## COUNT I

**Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants Terrance J. McCabe, Marc S. Weinberg and Edward D. Conway**

67.    The preceding paragraphs are incorporated. This Count relates to unauthorized and illegal charges to members of the Foreclosure Class for foreclosure fees and expenses. For purposes of this Count, the defendants are Terrance J. McCabe, Marc S. Weisberg and Edward D. Conway and the RICO enterprise, as defined by 18 U.S.C. § 1961(3), is MWC.

68.    Mr. Murphy is a "person" as defined by RICO, 18 U.S.C. § 1961(3).

69.    Section 1962(c) of RICO provides that it:

> shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

70.    Defendants Terrance J. McCabe, Marc S. Weinberg and Edward D. Conway ("MWC Partners") violated RICO by committing mail and/or wire fraud to further BOA's unauthorized

and/or illegal attorneys' fees collection schemes.  Mr. Murphy and the Foreclosure Class were damaged as a result.

71.   The MWC Partners are "persons" as defined by RICO, 18 U.S.C. § 1961(3).   The MWC Partners violated RICO, 18 U.S.C. § 1962(c), by the unauthorized and/or illegal foreclosure acts described herein.

72.   MWC is an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4).   As a RICO enterprise (the "MWC Enterprise"), MWC has engaged in, and its foreclosure activities have affected, interstate commerce.

73.   The MWC Partners are associated with or employed by MWC to file foreclosure complaints, wherein unauthorized and unincurred attorneys' fees for services were demanded. The MWC Partners knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the foreclosure activities of MWC through a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).   The racketeering activity was made possible by MWC's reliance on the MWC Partner's debt collecting activities for BNY Mellon and other lenders.   The MWC Partners had the specific intent to engage in the substantive RICO conduct as alleged.

74.   The MWC Partners made a number of unauthorized and/or illegal foreclosure-related attorneys' fees collection attempts and communicated with the MWC Enterprise by mail and/or wire (i.e., electronically), as well as through the U.S. mails in furtherance of MWC's foreclosure overcharging and collection scheme.   The MWC Partners would not have been unable to carry out their illegal attorneys' fees collection schemes unless they used the U.S. mails or interstate wires that constituted predicate acts of racketeering activity indictable under 18 U.S.C.§ 1961(1)(B).

75.   Operating through the MWC Enterprise, the MWC Partners developed and implemented policies and procedures to carry out the unauthorized and/or illegal attorneys' fees collection schemes.  These policies and procedures including filing foreclosure complaints that contained demands for attorneys' fees that were unauthorized and/or illegal.

76.   The wrongful foreclosure-related attorneys' fees charged, liened and/or collected from Mr. Murphy and members of the Foreclosure Class resulted in unauthorized and/or illegal economic benefits to the MWC Partners, as well as the MWC Enterprise.  MWC, as the foreclosure firm, charged unauthorized and/or illegal attorneys' fees based on the MWC Partners', and other partners' and associates', fixed fee demands.  The MWC Partners, as foreclosure counsel, collected fees through MWC and from Mr. Murphy and members of the Foreclosure Class that bear no relation to the work actually performed, that were fixed fees not based on work done on an hourly basis, and that were in excess of those authorized by the mortgages and/or permitted by state law.  The MWC Partners' use of the U.S. mails or interstate wires to carry out MWC's schemes economically injured Mr. Murphy and the members of the Foreclosure Class.

77.   The MWC's Partners' foreclosure-related racketeering acts were not isolated, but were related in that they had the same or similar purpose and result, participants, and foreclosure-related methods of commission.  Further, the MWC Partners' racketeering acts were ongoing and continuous during the ten-year period preceding this lawsuit.

78.   The MWC Enterprise was not limited to the predicate acts and extended beyond its racketeering activities to legitimate activities outside of the foreclosure procedure.  It existed separate and apart from the pattern of its racketeering activities for the legitimate business purpose of legal services.  The MWC Partners also have engaged in, and continue to engage in,

legitimate business outside of their pattern of racketeering activities.

79.   The MWC Partners participated in the acts of MWC through the multiple acts of racketeering as described in this Complaint.  The MWC Partners committed acts constituting indictable offenses under 18 U.S.C §§ 1341 and 1343 in that they devised or intended to devise schemes to collect unauthorized and/or illegal attorneys' fees from Mr. Murphy and members of the Foreclosure Class.  For the purpose of executing their schemes, the MWC Partners caused documents to be delivered by the U.S. mails or received such therefrom.  The MWC Partners also transmitted or caused various writings to be transmitted by means of wire communications in interstate commerce.  The acts of MWC Partners were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance the MWC Partners' wrongful schemes and participate in the MWC Partners' wrongful attorney fee collection schemes.

80.   The MWC Partners' violations of state and federal law, as set forth in this Complaint, each of which directly and proximately economically injured Mr. Murphy and members of the Foreclosure Class, constituted a continuous course of conduct beginning within the ten (10) years preceding the date on which this Complaint is filed and continuing through the present.  These violations included charging and collecting unauthorized and illegal attorneys' fees, which were a part of a pattern of racketeering activity under RICO, §§ 1961(1) and (5).

81.   The MWC Partners have conducted and/or participated, directly or indirectly, in the conduct of the affairs of the MWC Enterprise through a pattern of racketeering activity as described herein in violation of RICO, 18 U.S.C. § 1962(c).

82.   The unlawful actions of the MWC Partners have directly, illegally and proximately

caused and continue to cause economic injuries to Mr. Murphy and members of the Foreclosure Class. Mr. Murphy seeks an award of damages, on behalf of himself and the members of the Foreclosure Class, for the economic injuries created by the MWC Partners' series of unauthorized and illegal attorneys' fees charges, liens and/or collections.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Foreclosure Class, respectfully requests that judgment be entered against each of the Defendant MWC Partners for a statutory award of triple actual damages, costs and attorneys' fees, as authorized by 18 U.S.C. § 1964(c), and such other relief as the Court deems proper.

## COUNT II

**Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants BOA and QBE Insurance**

83. The preceding paragraphs are incorporated. This Count relates to unauthorized and illegal charges to members of the Force-Placed Insurance Class for force-placed insurance. For purposes of this Count, the defendants are BOA and QBE Insurance and the RICO enterprise, as defined by 18 U.S.C. § 1961(3), is an association-in-fact consisting of BOA, QBE Insurance and QBE First.

84. Defendants BOA and QBE Insurance violated RICO by committing mail and/or wire fraud in connection with the issuance of force-placed insurance on property securing the mortgages of Mr. Murphy and members of the Force-Placed Insurance Class, the charging and/or collection of unauthorized and/or illegal premiums for such coverage, and the receipt of, and failure to disclose, illegal kickbacks (in the form of commissions or other unauthorized payments) in connection with such force-placed coverage. The acts of mail and/or wire fraud of defendant BOA described herein damaged Mr. Murphy and the members of the Force-Placed Insurance Class.

85.   Defendants BOA and QBE Insurance are "persons" as defined by RICO, 18 U.S.C. § 1961(3).   Defendants BOA and QBE Insurance violated RICO, 18 U.S.C. § 1962(c) through the unauthorized and/or illegal acts described herein with respect to the issuance of force-placed insurance and charging of purported premiums therefor to the members of the Force-Placed Insurance Class.

86.   An association-in-fact consisting of (among possibly others to be identified through discovery) BOA, QBE Insurance and QBE First (the "Force-Placed Insurance Enterprise") is an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4).   As a RICO enterprise, the Force-Placed Insurance Enterprise has engaged in, and its foreclosure activities have affected, interstate commerce.

87.   The members of the Force-Placed Insurance Enterprise are associated together for a common purpose of engaging in illegal conduct involving the force-placement of insurance coverage on properties securing the mortgages of homeowners that are serviced by BOA.   There are written contracts among the members of the Force-Placed Insurance Enterprise, and also among the Defendants, that establish ongoing contractual relationships among such persons.

88.   The Force-Placed Insurance Enterprise is an ongoing organization and the association constituents function as an ongoing unit, separate and apart from the pattern of activity in which it engages.

89.   The Force-Placed Insurance Enterprise has been in existence for a sufficient duration and has sufficient longevity to allow the members thereof to pursue the illegal purpose of the enterprise.

90.   Defendants BOA and QBE Insurance knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the unlawful force-placed insurance activities described

herein through a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  Defendants BOA and QBE Insurance had the specific intent to engage in the substantive RICO conduct as alleged.

91.   Defendants BOA and QBE Insurance engaged in numerous instances of charging and/or collecting illegal and unauthorized force-placed insurance premiums through the Force-Placed Insurance Enterprise by mail and/or wire (*i.e.*, electronically), as well as through the U.S. mails.  Defendants BOA and QBE Insurance would not have been unable to carry out their illegal force-placed insurance scheme unless they used the U.S. mails or interstate wires that constituted predicate acts of racketeering activity indictable under 18 U.S.C.§ 1961(1)(B).

92.   Operating through the Force-Placed Insurance Enterprise, Defendants BOA and QBE Insurance developed and implemented policies and procedures to carry out their illegal force-placed insurance scheme.  These policies and procedures included the receipt of illegal kickbacks (in the form of commissions or other improper payments) from QBE Insurance (and/or its affiliates), which were ultimately paid by Mr. Murphy and members of the Force-Placed Insurance Class.

93.   The wrongful force-placed insurance premiums charged, liened and/or collected from Mr. Murphy and members of the Force-Placed Insurance Class, which included premiums that were kicked-back to defendant BOA, resulted in unauthorized and/or illegal economic benefits to defendant BOA, as well as the Force-Placed Insurance Enterprise.  BOA's and QBE Insurance's use of the U.S. mails or interstate wires to carry out the force-placed insurance scheme economically injured Mr. Murphy and the members of the Force-Placed Insurance Class.

94.   The force-placed insurance related racketeering acts of defendants BOA and QBE Insurance were not isolated, but were related in that they had the same or similar purpose and

result, participants, and methods of commission.   Further, the racketeering acts of defendants BOA and QBE Insurance were ongoing and continuous.

95.   The Force-Placed Insurance Enterprise was not limited to the predicate acts and extended beyond its racketeering activities to legitimate activities beyond the force-placed insurance scheme described herein.   It existed separate and apart from the pattern of its racketeering activities for the legitimate business purpose of providing insurance in a lawful manner.   Defendants BOA and QBE Insurance also have engaged in, and continue to engage in, legitimate business outside of their pattern of racketeering activities.

96.   Defendants BOA and QBE Insurance participated in the acts of the Force-Placed Insurance Enterprise through the multiple acts of racketeering as described in this Complaint. Defendants BOA and QBE Insurance committed acts constituting indictable offenses under 18 U.S.C §§ 1341 and 1343 in that they devised or intended to devise a scheme by which they (or their affiliates) would pay and/or receive illegal kickbacks (in the form of commissions or other improper payments) from the issuance of force-placed insurance and to charge and collect from Mr. Murphy and members of the Force-Placed Insurance Class premiums from which such kickbacks were paid.   For the purpose of executing their scheme, defendants BOA and QBE Insurance caused documents to be delivered by the U.S. mails or received such therefrom. Defendants BOA and QBE Insurance also transmitted or caused various writings to be transmitted by means of wire communications in interstate commerce.   The acts of defendants BOA and QBE Insurance were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.   These acts were done intentionally and knowingly with the specific intent to advance the wrongful scheme of the Force-Placed Insurance Enterprise.

97.   The violations of state and federal law and the mortgage contracts by defendants BOA and QBE Insurance as set forth in this Complaint, each of which directly and proximately economically injured Mr. Murphy and members of the Force-Placed Insurance Class, constituted a continuous course of conduct and were a part of a pattern of racketeering activity under RICO, §§ 1961(1) and (5).

98.   Defendants BOA and QBE Insurance have conducted and/or participated, directly or indirectly, in the conduct of the affairs of the Force-Placed Insurance Enterprise through a pattern of racketeering activity as described herein in violation of RICO, 18 U.S.C. § 1962(c).

99.   The unlawful actions of Defendants BOA and QBE Insurance have directly, illegally and proximately caused and continue to cause economic injuries to Mr. Murphy and members of the Force-Placed Insurance Class.  Mr. Murphy seeks an award of damages, on behalf of himself and the members of the Force-Placed Insurance Class, for the economic injuries created by defendants BOA's and QBE Insurance's illegal force-placed insurance conduct.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that judgment be entered against defendants BOA and/or QBE Insurance for a statutory award of triple actual damages, costs and attorneys' fees, as authorized by 18 U.S.C. § 1964(c), and such other relief as the Court deems proper.

## COUNT III

**Against Defendants BNY Mellon, BOA, and MWC for Charging and/or Collecting Prohibited Foreclosure - Related Attorneys' Fees and Legal Expenses in Violation of Act 6**

100.   The preceding paragraphs are incorporated.

101.   The Act 6 term "legal expenses," see 41 P.S. § 406(3),includes foreclosure-related expenses, including, inter alia, attorneys' fees, inspection fees, title search fees, BPO charges, and certain corporate and/or escrow advances related to the foreclosure process.

102. This Count against defendants BNY Mellon, BOA and MWC arises under the Act 6, 41 P.S. §§ 101, *et seq.* This Count includes, but is not limited to, members of the Foreclosure Class with purported state judgments that were not signed by a Court, but by, for example, the Prothonotary or its Deputy. This Count also includes post judgment attorneys' fees and legal expenses entered by a Prothonotary or Deputy, unless such fees were added by the Prothonotary in the course of a merely ministerial implementation of a signed Court Order. This Count excludes homeowners who paid foreclosure attorneys' fees and costs as a result of a state judgment signed by a Court.

103. Act 6, 41 P.S. § 101 includes within its broad scope "persons" and "residential mortgage lenders," defined as follows:

> "Person" means an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders.
> \*   \*   \*
> "Residential mortgage lender" means any person who lends money or extends or grants credit and obtains a residential mortgage to assure payment of the debt. The terms shall also include the holder at any time of a residential mortgage obligation.

104. Defendant BNY Mellon and BOA are Act 6 "residential mortgage lender[s]" and/or "person[s]," based on their debt collection, loan forbearance, and detention activities.

105. Defendant MWC, based on its debt collection activities, is an Act 6 "person" and in that capacity is liable for the illegal conduct of "residential mortgage lenders."

106. Act 6, 41 P.S. § 406, with respect to the misconduct of "residential mortgage lenders" provides:

> With regard to residential mortgages, no residential mortgage lender shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:
> (1) Reasonable fees for services included in actual settlement costs.

(2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are reasonable and actually incurred by the residential mortgage lender may be charged to the residential mortgage debtor.

(3) Prior to commencement of foreclosure or other legal action attorneys' fees which are reasonable and actually incurred not in excess of fifty dollars ($50) provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act.

107. Defendants BNY Mellon, BOA and MWC demanded attorneys' fees and legal expenses that violated § 406 because they charged and/or collected:

(1)    Foreclosure-related attorneys' fees and legal expenses before they were "actually incurred";

(2)    Foreclosure-related attorneys' fees and costs (in excess of $50) allegedly incurred before the thirty-three (33) day right to cure expired and/or allegedly incurred prior to the commencement of its foreclosure action; and/or

(3)    Liquidated foreclosure-related fees and costs (pre and/or post the foreclosure judgment) that had not been awarded by a court.

108. In addition, the above attorneys' fees and legal expenses charged and/or collected violated Act 6 because they were not authorized by the mortgage contracts, nor the notes, of the members of the Foreclosure Class.

109. Act 6 statutory attorneys' fees constitute damages that are not liquidated and, therefore, can only be determined by a court. See Act 6, 41 P.S. § 406. Also see Pa.R.Civ.P. 1147(a)(5), limiting the power of a Prothonotary to entering judgments on liquidated, as opposed to un-liquidated damages. The Prothonotary lacks the judicial power to enter a monetary judgment for un-liquidated damages absent express direction from a court. Instead, the Prothonotary is only empowered to enter a default judgment for liquidated damages of a "sum certain or which can be

made certain by computation." Pa.R.Civ.P. 1037(b)(1).

110. Defendants breached their obligations under Act 6 by charging and/or collecting attorneys' fees that were unreasonable, because, *inter alia*, they were calculated on a flat-rate or percentage-of-debt basis instead of an hourly basis and without express contractual authority in the mortgages.

111. Defendants breached their obligations under Act 6 by charging and/or collecting attorneys' fees and costs before they were incurred or that were not incurred at all.

112. Members of the Foreclosure Class were charged and/or paid attorneys' fees even before receipt of a true Act 6 or Act 91 Notice. See 41 P.S. § 403(a). In such cases, it was also a violation of Act 6 to charge attorneys' fees or legal expenses, irrespective of the label, in excess of $50.00 prior to the commencement of foreclosure. See 41 P.S. § 406(3).

113. The unauthorized attorneys' fees and legal expenses that Defendants demanded and/or collected are recoverable under Act 6, 41 P.S. §§ 501-04. Plaintiff Mr. Murphy and members of the Foreclosure Class incurred these unauthorized charges, through their being added to the amount of liens against their property.

WHEREFORE, Mr. Murphy, on behalf of the members of the Foreclosure Class, respectfully requests that judgment be entered against defendants BNY Mellon, BOA and/or MWC and that the Court award statutory damages and reasonable attorneys' fees, costs, and expenses under Act 6, 41 P.S. §§ 501-04. Alternatively, Mr. Murphy, on behalf of the Foreclosure Class, respectfully requests set-offs computed at triple the excess charges paid. Mr. Murphy, on behalf of the Foreclosure Class, further requests an accounting, an award of statutory attorneys' fees under Act 6, 41 P.S. §§ 503-504, and such other relief as the Court deems proper.

## COUNT IV

**Against Defendants BNY Mellon, BOA and MWC for Violations of Act 6 in Charging And Collecting Illegal Foreclosure Attorneys' Fees and Legal Expenses in Violation of Act 6 and Act 91**

114.  The preceding paragraphs are incorporated.

115.  In Pennsylvania, the Note is the only debt instrument.  The Mortgage only secures the Note and is not a debt instrument.  The Mortgage, therefore, automatically must follow the Note.  Only the noteholder can be the Pa.R.Civ.P. 2002 real party in interest in an action filed under Pa.R.Civ.P. 1147.   Therefore, only noteholders can commence foreclosure proceedings in Pennsylvania.

116.  The Foreclosure Complaint filed against Mr. Murphy does not plead whether or not it is filed by the noteholder and it is, therefore, averred that it and many of Defendants' Foreclosure Complaints were not filed by noteholders, but instead were filed by mortgagees (who did not own the Note) and/or servicers.

117.  The Foreclosure Complaints filed against members of the Foreclosure Class are defective for one or more of the following reasons:

      (1)     The mandatory Act 6 and/or Act 91 Notice was never sent;

      (2)     The Act 6 and/or Act 91 Notice was not sent by the mortgagee;

      (3)     The Act 6 and/or Act 91 Notice was not sent and/or the Foreclosure Complaint by the entity who made the acceleration decision;

      (4)     The Act 6 and/or Act 91 Notice was not sent by the entity that filed the Foreclosure Complaint;

      (5)     The Act 6 and/or Act 91 Notice sent failed to include mandatory language informing Homeowners that they may have the right to refinance their loan, as required by Act 6;

(6)     The Act 6 and/or Act 91 Notice sent failed to include mandatory language informing Homeowners that the purpose of the face-to-face meeting with a consumer credit counseling agency was "to attempt to resolve the delinquency or default by restructuring the loan payment schedule or otherwise" as required by Act 91;

(7)     Before September 8, 2008, the Notice failed to include the mandatory language informing Homeowners that they have a right to meet with the mortgagee;

(8)     The Notice failed to include the mandatory list of credit counseling agencies; and/or

(9)     The foreclosure plaintiff was not the noteholder.  See Pa.R.Civ.P. 2002 (the plaintiff must be a real party in interest).

WHEREFORE, Mr. Murphy, on behalf of the members of the Foreclosure Class, respectfully requests that judgment be entered against defendants BNY Mellon, BOA and/or MWC and that the Court award statutory damages and reasonable attorneys' fees, costs, and expenses under Act 6, 41 P.S. §§ 501-04.  Alternatively, Mr. Murphy, on behalf of the Foreclosure Class, respectfully requests set-offs computed at triple the excess charges paid.  Mr. Murphy, on behalf of the Foreclosure Class, further requests an accounting, an award of statutory attorneys' fees under Act 6, 41 P.S. §§ 503-504, and such other relief as the Court deems proper.

## COUNT V

**Against Defendants BOA and MWC for Violations of the FDCPA, 15 U.S.C. §§ 1692, *et seq.*, in Using Deceptive and Other Unlawful Means in the Collection and Attempted Collection of Debt**

118.  The preceding paragraphs are incorporated by reference.

119.  This Count is brought under Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, against Defendants BOA and MWC as debt collectors.

120. Plaintiff is a "consumer" as defined by § 1692a(3) of the FDCPA.

121. The FDCPA prohibits, *inter alia*, debt collectors from using "any false, deceptive or misleading representation or means in connection with the collection of any debt," 15 U.S.C. § 1692e, or any "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. § 1692f.

122. Defendants BOA and MWC acted as the debt collectors for BNY Mellon in connection with the deceptive, misleading and other unlawful conduct taken with respect to the collection and attempted collection of the debt of Mr. Murphy and members of the Foreclosure Class, including the collection and attempted collection of attorneys' fees and legal costs in violation of Act 6, as set forth in Counts III and IV above..

123. Defendants BOA and MWC violated the above-cited sections of the FDCPA by demanding and collecting fees prohibited by Act 6.  In the foreclosure complaint filed against Mr. Murphy, McCabe demanded $1,145 in attorneys' fees, well in excess of the $50 maximum. Such sums could only have been incurred, if at all, prior to the commencement of foreclosure proceedings.  In addition, such amounts were neither reasonably calculated nor actually incurred.

124. Including the unlawful attorneys' fees and legal costs in the complaint caused MWC to violate § 1692e of the FDCPA, because the inflated amount falsely represented the "character, amount or legal status" of Mr. Murphy's debt, thereby rendering the complaint a "false, deceptive or misleading representation."  15 U.S.C. § 1692e(2)(A).  The inclusion of such fees also violated § 1692e(10), which prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt," and § 1692e(5), which prohibits "the threat to take any action that cannot legally be taken."

125. In addition, Defendants BOA and MWC violated the above provisions of the FDCPA

because the foreclosure complaints they caused to be filed against Mr. Murphy and members of the Foreclosure Class demanded fixed attorneys' fees that were neither contractually authorized, legal, or reasonable because they were not actually incurred. Nor were the fees demanded based on hourly rates, and therefore had to be determined and set by a court. Thus, Defendants BOA and MWC violated the FDCPA by, *inter alia*, representing to homeowners in Foreclosure Complaints that that they owed amounts they did not owe, including charges for unauthorized, unincurred and illegal foreclosure-related attorneys' fees.

126. Defendants BOA and MWC also violated the FDCPA by using unfair or unconscionable means to collect debts and by charging, attempting to collect or collecting amounts that are not "expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. §§ 1692f, 1692f(1).

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Foreclosure Class, respectfully requests that the Court enter judgment against defendants BOA and MWC and that it award statutory damages and reasonable attorneys' fees, costs, and expenses, to the full extent authorized by 15 U.S.C. § 1692k, and such other relief as the Court deems proper.

## COUNT VI

**Against Defendants BNY Mellon, BOA and MWC for Violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq*.**

127. The preceding paragraphs are incorporated by reference.

128. Defendants violated the UTPCPL, 73 P.S. § 201-3, by engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce. In particular, defendants BNY Mellon, BOA and MWC engaged in "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

129. Defendants violated the UTPCPL by overcharging Mr. Murphy and members of the

Foreclosure Class for attorneys' fees and legal costs, thereby misrepresenting the amounts that they actually owed.

130. Certain members of the Foreclosure Class paid the misrepresented and overcharged amounts in whole or part, thereby incurring damages. Where members of the Foreclosure Class did not pay, the unauthorized charges were liened against their homes, thereby decreasing the value of their property. Mr. Murphy and members of the Foreclosure Class therefore suffered an ascertainable loss of money or property as the result of conduct on the part of defendants BNY Mellon, BOA and MWC that constituted unlawful acts and practices proscribed by the UTPCPL.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Foreclosure Class, respectfully requests that the Court enter judgment against defendants BNY Mellon, BOA and MWC and that the Court award compensatory, statutory and treble damages, and reasonable attorneys' fees, costs, and expenses, to the full extent authorized by 73 P.S. § 201-9.2, and such other relief as the Court deems proper.

## COUNT VII

### Against BNY Mellon and BOA for Breach of Contract

131. The preceding paragraphs are incorporated by reference.

132. Defendant BNY Mellon has represented itself to be the owner of Mr. Murphy's Note and the assignee of the Mortgage securing the Note.

133. In servicing the mortgages of Mr. Murphy and other members of the Foreclosure Class, BOA undertook various servicing activities, which included advancing funds (or credit) to Mr. Murphy and class members for costs, expenses and fees including advancement of attorneys' fees (when deemed due and owing by the mortgagor) to, *inter alia*, protect the mortgagee's interest in the mortgaged properties. When BOA advanced such money or credit to Mr. Murphy

and other class members, it unilaterally increased their unpaid debt by the amount advanced.  As a result of these activities, as well as others undertaken by BOA under its servicing agreements, BOA was not merely engaged in servicing loans for BNY Mellon, as trustee, but also was acting as a creditor and lender.  Indeed, for example, in the Act 91 Notice issued by Countrywide Home Loans Servicing, LP to Mr. Murphy (Exhibit F hereto), Countrywide Home Loans Servicing, LP identified itself as the "lender" with respect to Mr. Murphy's mortgage.   In addition, in connection with notices sent by BOA and its predecessors with respect to force-placed insurance, BOA represented that it has a protectable interest in the property securing Mr. Murphy's mortgage and the Additional Named Insured Certificate issued by QBE Insurance (Exhibit H hereto) identified BOA as the "NAMED INSURED MORTGAGEE."

134. Defendant BNY Mellon and BOA breached their contractual obligations to Mr. Murphy and the Foreclosure Class by charging and/or collecting legal fees and costs in violation of the terms of the standardized mortgage contracts into which it entered with Mr. Murphy and members of the Foreclosure Class.

135. Mr. Murphy's Mortgage contract provides that the lender "may not charge fees that are expressly prohibited... by Applicable Law."  Exhibit A, ¶ 14.  The Mortgage further specifies that, in instances of a borrower's default, the lender may only charge fees for "services *performed*" in connection with that default.  Id. (emphasis added).  Finally, in the context of attorneys' fees and related costs, the Mortgage only permits the lender to collect "expenses *incurred*." Id., ¶ 22 (emphasis added).  These provisions are standard terms found in most, if not all, residential mortgages.

136. BNY Mellon and BOA violated all of these provisions by charging and/or collecting legal fees and costs that violated Act 6.  As noted above, Act 6 only authorizes a mortgagee to

collect "reasonable" and "actually incurred" legal fees as awarded by a court. 41 P.S. § 406(2). Prior to the commencement of a foreclosure action, these "reasonable" fees that were "actually incurred" are capped at $50. 41 P.S. § 406(3).

137. BNY Mellon and BOA far exceeded Act 6's statutory cap and violated Act 6's requirement that fees be actually incurred when they attempted to impose a flat attorney's fee of $1,145.00. These actions thereby amounted to charging fees "expressly prohibited" by law, in violation of Mr. Murphy's standard Mortgage contract. These actions also amounted to charging fees for services not performed, in contrast to the Mortgage contract's explicit language requiring that any fees be for services actually performed.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Foreclosure Class, respectfully requests that the Court enter judgment against BNY Mellon and BOA and that the Court award compensatory damages and costs, and such other relief as the Court deems proper.

## COUNT VIII

### Against BNY Mellon and BOA for Violations of the Real Estate Settlement, and Procedures Act, 12 U.S.C. §§ 2601, *et seq.*, Relating to Force-Placed Insurance

138. The preceding paragraphs are incorporated.

139. Under RESPA, 12 U.S.C. §§ 2601, *et seq.*, "[a]ll charges… related to force-placed insurance imposed on the borrower by or through the servicer shall be bona fide and reasonable." 12 U.S.C. § 2605(m).

140. The charges imposed on Mr. Murphy and the other members of the Force-Placed Insurance Class were not bona fide and reasonable. Among other reasons, the premiums charged were for coverages that were excessive, unwarranted and beyond the scope of the contractual authorization for the placement of coverage. In addition, the charges were neither bona fide nor

reasonable due to the fact that, on information and belief, a significant portion of the premiums paid to QBE Insurance (and for which borrowers were charged) were returned to BNY Mellon and/or BOA (or affiliates thereof) in the form of illegal, unearned commissions or other payments that were disguised kickbacks. Such kickbacks were not disclosed to Mr. Murphy and members of the Force-Placed Insurance Class and their payment resulted in Mr. Murphy and members of such class being charged, unreasonably, for amounts in excess of the premiums for the coverage actually paid by BNY Mellon and/or BOA.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests an award of damages as authorized by RESPA, 12 U.S.C. § 2605(f), against Defendants BNY Mellon and/or BOA, including but not limited to (i) actual damages incurred by Mr. Murphy and the members of the Force-Placed Insurance Class, as authorized by 12 U.S.C. § 2605(f)(2)(A), (ii) additional damages, to the full extent authorized by 12 U.S.C. § 2605(f)(2)(B), and (iii) the costs of this action, including reasonable attorneys' fees, as authorized by 12 U.S.C. § 2605(f)(3).

## COUNT IX

### Against BNY Mellon and BOA for Violations of the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.*, Relating to Force-Placed Insurance

141. The preceding paragraphs are incorporated.

142. Residential mortgage loan agreements such as those to which Mr. Murphy and the members of the Force-Placed Insurance Class were parties are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq.*, and all related regulations, commentary and interpretive guidance promulgated by the Federal Reserve Board.

143. BNY Mellon and BOA are "creditors" as defined by TILA, with respect to Mr. Murphy's Mortgage and those of members of the Force-Placed Insurance Class.

144. BNY Mellon and BOA are required to clearly, conspicuously and timely disclose all finance charges, other charges and third-party charges that may be imposed in connection with a mortgage loan.

145. BNY Mellon and BOA are further required to accurately and fully disclose the terms of the legal obligation between the parties.

146. BNY Mellon's and BOA's addition of a charge for the unauthorized and excessive force-placed insurance issued with respect to Mr. Murphy's residence, which increased the amount of Mr. Murphy's indebtedness, constituted a refinancing, *i.e.*, a new credit transaction involving new finance charges within the scope of 12 C.F.R. § 226.18 and triggered an obligation to make new disclosures to Mr. Murphy.

147. BNY Mellon and BOA failed to make the new disclosures that were required when the charge for force-placed insurance was added to Mr. Murphy's Mortgage loan balance in or about May 2013.

148. BNY Mellon and BOA systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Force-Placed Insurance Class.

149. Mr. Murphy and the members of the Force-Placed Insurance Class have been injured and have suffered a monetary loss as a result of BNY Mellon's and BOA's violations of TILA.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that the Court enter judgment against BNY Mellon and/or BOA and that the Court award damages as authorized by TILA, including (i) actual damages, as authorized by 15 U.S.C. § 1640(a)(1), (ii) the full extent of additional damages, as authorized in a class action by 15 U.S.C. § 1640(a)(2)(B), and (iii) costs, including reasonable attorneys' fees, as authorized by 15 U.S.C. § 1640(a)(3), and such other relief as the Court deems proper.

### COUNT X

**Against BNY Mellon and BOA for Breach of Contract Relating to Force-Placed Insurance**

150. The preceding paragraphs are incorporated.

151. Under the terms of Mr. Murphy's Mortgage, BNY Mellon and BOA were contractually limited in the scope and amount of force-placed insurance for which Mr. Murphy could be charged. For example, Mr. Murphy properly could be charged only to the extent of "amounts disbursed by Lender." Ex. A, ¶¶ 5, 9.

152. BNY Mellon and BOA materially breached the terms of Mr. Murphy's Mortgage by increasing his debt by the full amount of the force-placed premiums, *i.e.*, without accounting for the kickbacks paid to BOA and/or its affiliates.

153. In addition, BNY Mellon and BOA owed Mr. Murphy and members of the Force-Placed Insurance Class a duty of good faith and fair dealing through the contractual relationship with Mr. Murphy and such class members.

154. BNY Mellon and BOA breached this duty by, among other things:

    a. demanding and/or force-placing more insurance coverage than authorized by the contracts;

    b. demanding and/or force-placing more insurance coverage than authorized;

    c. unreasonably exercising in bad faith any purported discretionary authority BNY Mellon and/or BOA claims it was afforded under the loan and mortgage documents;

    d. charging borrowers sham "costs" for force-placed insurance that did not reflect the true cost to BNY Mellon and BOA because, on information and belief, a portion of such "costs" were retained by BNY Mellon and/or BOA (and/or their affiliates), or kicked back to them, as commissions or other purported

compensation.

155.  BNY Mellon and BOA willfully engaged in the foregoing conduct in bad faith, for the improper purposes of unfairly and unconscionably maximizing revenue from borrowers, generating commissions, interest, fees and other compensation for BNY Mellon and BOA, and/or their affiliates, and gaining unwarranted contractual and legal advantages.

156.  As a result of BNY Mellon's and BOA's breaches of contract including breaches of the covenant of good faith and fair dealing, Mr. Murphy and the members of the Force-Placed Insurance Class have been injured, and have suffered actual damages and monetary losses in the form of increased insurance premiums, escrow charges interest payments, additional liens, encumbrances and burdens on their property rights, and/or other charges.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that judgment be entered against BNY Mellon and BOA and that the Court award compensatory damages, the costs of this action and such other relief as the Court deems proper.

## COUNT XI

### Against BNY Mellon, BOA, QBE Insurance and QBE First for Violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 2-101, *et seq.*, Relating to Force-Placed Insurance

157.  The preceding paragraphs are incorporated.

158.  As a result of their wrongful conduct related to force-placed insurance, which resulted in Mr. Murphy and members of the Force-Placed Insurance Class being charged for unauthorized and illegal  premiums for force-placed insurance, defendants BNY Mellon, BOA, QBE Insurance and QBE First violated the UTPCPL, 73 P.S. § 201-3, by engaging in unfair or deceptive acts or practices in the conduct of any trade or commerce.  In particular, these defendants engaged in "fraudulent or deceptive conduct which creates a likelihood of confusion

or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

159. Defendants BNY Mellon, BOA, QBE Insurance and QBE First violated the UTPCPL by, among other things, engaging in and participating in conduct that led to the force-placing of more insurance coverage than was reasonably necessary or warranted to protect the lender's interest in the property securing the mortgages of Mr. Murphy and other members of the Force-Placed Insurance Class, the placing of insurance coverage that was unauthorized by Mr. Murphy's and such class members' mortgage contracts, and the payment and receipt of kickbacks (in the form of commissions or other purported compensation) that were not disclosed to Mr. Murphy or members of the Force-Placed Insurance Class and that were wrongfully charged to Mr. Murphy and members of the Force-Placed Insurance Class as part of the purported cost of the force-placed insurance.

160. As a result of the above violations of the UTPCPL by defendants BNY Mellon, BOA, QBE Insurance and QBE First, Mr. Murphy and the members of the Force-Placed Insurance Class have incurred ascertainable losses of money or property in the form of increased insurance premiums, escrow charges interest payments, additional liens, encumbrances and burdens on their property rights, and/or other charges.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that judgment be entered against BNY Mellon, BOA, QBE Insurance and/or QBE First and that the Court award compensatory, statutory and treble damages, reasonable attorneys' fees, costs, and expenses, to the full extent authorized by 73 P.S. § 201-9.2, and such other relief as the Court deems proper.

## COUNT XII

**Against BNY Mellon, BOA, QBE Insurance and QBE First for Unjust Enrichment/Disgorgement (In the Alternative to the Breach of Contract Claims)**

161.  The preceding paragraphs are incorporated.

162.  Mr. Murphy and the members of the Force-Placed Insurance Class have conferred substantial benefits upon defendants BNY Mellon, BOA, QBE Insurance and QBE First through their payment of force-placed insurance premiums and/or through the force-placed insurance coverage that led to their being charged for such premiums.

163.  Premium payments made by or on behalf of members of the Force-Placed Insurance Class were accepted and retained by defendants BNY Mellon, BOA, QBE Insurance and QBE First under circumstances such that it would be inequitable for these defendants to retain such benefits without payment to Mr. Murphy and the members of the Force-Placed Insurance Class.

164.  As a result of the unjust enrichment of defendants BNY Mellon, BOA, QBE Insurance and QBE First, Mr. Murphy and members of the Force-Placed Insurance Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of all amounts by which defendants BNY Mellon, BOA, QBE Insurance and QBE First have been unjustly enriched.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that judgment be entered against BNY Mellon, BOA, QBE Insurance and/or QBE First and that the Court award compensatory damages and such other relief as the Court deems proper.

## COUNT XIII

**Against QBE Insurance and QBE First for Interference with Contractual Relations**

165.  The preceding paragraphs are incorporated.

166.  Mr. Murphy and members of the Force-Placed Insurance Class have, or had, advantageous business and contractual relationships with mortgagees pursuant to their mortgage contracts.

167.  Mr. Murphy and members of the Force-Placed Insurance Class have legal rights under the mortgage contracts, including the right to be charged only those premiums for force-placed insurance that are contractually authorized.

168.  QBE Insurance and QBE First had knowledge of the mortgage contracts and the contractual relationships between Mr. Murphy and members of the Force-Placed Insurance Class on the one hand and the mortgagees on the other hand.

169.  QBE Insurance and QBE First intentionally, unjustifiably and without privilege interfered with the contractual relationships that Mr. Murphy and members of the Force-Placed Insurance Class had with mortgagees through entering into arrangements under which QBE Insurance, QBE First and/or their affiliates paid kickbacks to BOA or others.  QBE Insurance and QBE First knew that Mr. Murphy and members of the Force-Placed Insurance Class would be charged the full amount of the force-placed insurance premiums including the amounts that were subject to kickbacksand that Mr. Murphy and members of the Force-Placed Insurance Class would thereby be charged amounts that were not authorized by the mortgage contracts.

170.  Mr. Murphy and members of the Force-Placed Insurance Class have been damaged as a result of QBE Insurance's and QBE First's interference with their mortgage contracts.

171.  The unlawful conduct of defendants QBE Insurance and QBE First was willful, wanton, outrageous and in reckless indifference to the rights of Mr. Murphy and members of the

Force-Placed Insurance Class.  Mr. Murphy and the members of the Force-Placed Insurance Class therefore are entitled to an award of punitive damages.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Force-Placed Insurance Class, respectfully requests that judgment be entered against BNY Mellon, BOA, QBE Insurance and/or QBE First, and that the Court award compensatory damages, punitive damages, the costs of this action, and such other relief as the Court deems proper.

## COUNT XIV

### Against BNY Mellon, BOA, QBE
### Insurance and QBE First for Civil Conspiracy

172.  The preceding paragraphs are incorporated.

173.  Defendants agreed among themselves to engage in the wrongful conduct described above that resulted in Mr. Murphy and members of the Force-Placed Insurance Class being charged for force-placed insurance premiums in amounts that were not contractually authorized and that were otherwise illegal.

174.  In agreeing to engage in the force-placed insurance scheme described above, Defendants acted with a common purpose to charge Mr. Murphy and members of the Force-Placed Insurance Class for unauthorized premiums and for QBE Insurance and its affiliates to kick back substantial portions of such premiums to BNY Mellon or BOA (or their affiliates), in the form of commissions or other improper payments.

175.  Defendants combined or agreed with intent to do an unlawful act or do an otherwise lawful act by unlawful means.  Defendants acted maliciously and with the intent to harm Mr. Murphy and members of the Force-Placed Insurance Class.

176.  Each of the Defendants engaged in overt acts in pursuance of Defendants' common purpose.

177. Mr. Murphy and members of the Force-Placed Insurance Class have been damaged as a result of acts taken by Defendants in furtherance of their conspiracy.

178. The unlawful conduct of Defendants was willful, wanton, outrageous and in reckless indifference to the rights of Mr. Murphy and members of the Force-Placed Insurance Class.  Mr. Murphy and the members of the Force-Placed Insurance Class therefore are entitled to an award of punitive damages.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the Foreclosure Class, respectfully requests that the Court enter judgment against all Defendants and that the Court award compensatory damages, punitive damages, costs, and expenses, and such other relief as the Court deems proper.

## REQUEST FOR RELIEF

Mr. Murphy, on behalf of himself and members of the Foreclosure Class and the Force-Placed Insurance Class, respectfully requests the following relief against Defendants:

(1)    Under Count I, a statutory award of triple actual damages, costs and attorneys' fees, as authorized by 18 U.S.C. § 1964(c), against defendants Terrance J. McCabe, Marc S. Weisberg, Edward D. Conway;

(2)    Under Count II, a statutory award of triple actual damages, costs and attorneys' fees, as authorized by 18 U.S.C. § 1964(c), against defendants BOA and QBE Insurance;

(3)    Under Counts III and IV, an award of statutory damages, attorneys' fees, costs and expenses as authorized by Act 6, 41 P.S. §§ 501-04 (in the alternative, set-offs computed at triple the excess charges paid) against defendants BNY Mellon, BOA and MWC, as well as an accounting, and an award of statutory attorneys' fees under 41 P.S. §§ 503, 504;

(4)    Under Count V, an award of statutory damages and reasonable attorneys' fees, costs,

and expenses, as authorized by 15 U.S.C. § 1692k, against defendants BOA and MWC;

(5)   Under Count VI, an award of compensatory, statutory and treble damages, and reasonable attorneys' fees, costs, and expenses, as authorized by 73 P.S. § 201-9.2, against defendants BNY Mellon, BOA and MWC;

(6)   Under Counts VII and X, an award of compensatory damages and costs of suit against defendants BNY Mellon and BOA;

(7)   Under Count VIII, an award of damages authorized by RESPA, 12 U.S.C. § 2605(f), including actual damages, additional damages and attorneys' fees, against defendants BNY Mellon and BOA;

(8)   Under Count IX, an award of damages authorized by TILA, 15 U.S.C. § 1640(a), including actual damages, additional damages, costs and attorneys' fees, against defendants BNY Mellon and BOA;

(9)   Under Count XI, an award of compensatory, statutory and treble damages, and reasonable attorneys' fees, costs, and expenses, as authorized by 73 P.S. § 201-9.2, against defendants BNY Mellon, BOA, QBE Insurance and QBE First; Under Count XII, an award of compensatory damages and costs of suit against defendants BNY Mellon, BOA, QBE Insurance and QBE First;

(10)  Under Count XIII, an award of compensatory damages, punitive damages and costs of suit against defendants QBE Insurance and QBE First;

(11)  Under Count XIV, an award of compensatory damages, punitive damages and costs of suit against defendants BNY Mellon, BOA, QBE Insurance and QBE First; and

(12)  Such other relief as the Court deems proper.

Respectfully Submitted,
MICHAEL P. MALAKOFF, P.C.

*Michael Malakoff*

Michael P. Malakoff, Esquire
Pennsylvania Attorney I.D. #11048
Jonathan R. Burns, Esquire    JRB
Pennsylvania Attorney I.D. #315206
Suite 200, The Frick Building
Pittsburgh, PA 15219
Telephone: (412) 281-4217
Facsimile:  (412) 281-3262
malakoff@mpmalakoff.com
jburns@mpmalakoff.com

Michael J. Betts, Esquire (Of Counsel)
Pennsylvania Attorney I.D. #33378
Suite 200, The Frick Building
Pittsburgh, PA 15219
Telephone: (412) 281-4217
Facsimile:  (412) 281-3262
mbetts@mpmalakoff.com

Seth Lesser, Esquire
KLAFTER OLSEN & LESSER, LLP
Two International Drive, Suite 350
Rye Brooke, NY 10573
Telephone: 914-934-9200
Facsimile: 914-934-9220
seth@klafterolsen.com
*Attorneys for Brian D. Murphy, individually
and on behalf of other similarly situated
current   and   former   homeowners   in
Pennsylvania*

September 27, 2013

**JURY TRIAL DEMANDED**