

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Brian D. Murphy, individually and on behalf of other similarly situated current and former homeowners in Pennsylvania,

                    Plaintiffs,

v.

Bank of America, N.A.; the Bank of New York Mellon, N.A., as trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11; McCabe, Weisberg & Conway, P.C.; Terrance J. McCabe; Marc S. Weisberg; Edward D. Conway; QBE Insurance Corporation; and, QBE First Insurance Agency, Inc.

                    Defendants.

Civil Action #2:13-cv-05719-RBS

**JURY TRIAL DEMANDED**



FILED

JAN 2 0 2015

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## AMENDED CLASS ACTION COMPLAINT

Brian D. Murphy ("Plaintiff" or "Mr. Murphy") brings this class action on behalf of himself and all others similarly situated against Bank of America, N.A.; the Bank of New York Mellon, N.A., as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11; McCabe, Weisberg & Conway, P.C.; Terrance J. McCabe; Marc S. Weisberg; and Edward D. Conway. This is a consumer Class Action Complaint filed on behalf of Pennsylvania Homeowners challenging, inter alia, systematic practices in demanding contractually unauthorized and/or illegal foreclosure-related attorneys' fees that increased their debt and that constituted liens on their property. As is set forth below, Defendants are liable to Mr. Murphy and other Homeowners under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq.; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, et seq.; the Pennsylvania Loan Interest and Protection Law ("Act 6"), 41 P.S. §§

101, et seq.; the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 et seq.; and, for breach of contract.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), in that this is a putative class action where members of the proposed class are citizens of a state different from any of the defendants, and the amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  In addition, jurisdiction over the federal causes of action (Counts V and VI) exists under 28 U.S.C. § 1331; jurisdiction over Count VI exists under RICO, 18 U.S.C. § 1964(c); jurisdiction over Count V exists under the FDCPA, 15 U.S.C. § 1692k(d); and, supplemental jurisdiction over the state law claims (Counts I, II, III and IV) exists under 28 U.S.C. § 1367.[1]

2.     Venue exists in this Court under 28 U.S.C. § 1391(b)(1) and (2) because (i) one or more of the Defendants reside in this District and all Defendants reside in this State, and (ii) a substantial part of the events and omissions giving rise to the claims set forth occurred in this District.

## THE PARTIES

3.     Named Plaintiff, Brian D. Murphy, is a natural person residing at 85 Short Street, Blairsville, Pennsylvania 15717. Mr. Murphy brings this action on his own behalf and on behalf of similarly situated Homeowners whose properties are located in Pennsylvania.

4.     Defendant, Bank of America, N.A. ("BOA"), is a national bank with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28202.  During the period of time relevant to the claims set forth herein, BOA was the servicer of Mr. Murphy's

---

[1] The causes of action in this Amended Complaint have been changed in an attempt to better organize the courts with respect to their relationships to each other.

Mortgage.[2] BOA also is the legal successor to Countrywide Home Loans, Inc., and Countrywide Home Loans Servicing, LP, both of which have, at one point, misrepresented to be the lender with respect to Mr. Murphy's Mortgage.

5.      Defendant, the Bank of New York Mellon ("BNY Mellon"), as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11, is a national bank with its principal place of business at 101 Barclay Street, 4W, New York, New York 10286. BNY Mellon is the mortgagee of Mr. Murphy's Mortgage.

6.      Defendant, McCabe, Weisberg and Conway, P.C. ("MWC"), is a professional corporation with its principal office located in this District at 123 South Broad Street, Suite 1400, Philadelphia, Pennsylvania 19109. As debt collecting counsel, MWC filed multiple Foreclosure Complaints against Mr. Murphy, and other class members. MWC is also an "enterprise" as defined by RICO, 18 U.S.C. §1961(3) and a "debt collector" as defined by the FDCPA, 15 U.S.C. §1692a(6).

7.      Defendant, Terrance J. McCabe, is an individual and Pennsylvania-licensed attorney. He is a founding shareholder, managing President and a partner of MWC. Under Count III, Mr. McCabe is also a Defendant-person as defined by RICO, 18 U.S.C. §1961(3).

8.      Defendant, Marc S. Weisberg, is an individual and Pennsylvania-licensed attorney. He is a founding shareholder, managing Vice President and a partner of MWC. Under Count III, Mr. Weisberg is also a Defendant-person as defined by RICO, 18 U.S.C. §1961(3).

9.      Defendant, Edward D. Conway, is an individual and Pennsylvania-licensed attorney. He is also a founding shareholder, managing Secretary and a partner of MWC. Under Count III, Mr. Conway is also a Defendant-person as defined by RICO, 18 U.S.C. §1961(3).

---

[2] "Servicer" means the entity responsible for the servicing of a mortgage loan, including the entity that makes or holds a mortgage loan if such entity also services the mortgage. 12 C.F.R. § 1024.2. Also see fn. 3, infra.

## OTHER PERSONS AND ENTITIES

10.  Non-party Countrywide Home Loans, Inc. ("Countrywide") is a failed financial institution that was acquired by BOA in 2008 during the Financial Institutions Reform, Recovery, and Enforcement Act. After BOA's acquisition of Countrywide, Countrywide was renamed Bank of America Home Loans ("BAC Home Loans"). BAC Home Loans was a wholly-owned subsidiary of BOA until 2011, when it was merged into BOA. See Federal Trade Commission v. Countrywide Home Loans, Inc., and BAC Home Loans Servicing, LP, No. 10-04193-JFW-SSX, Document 15 (C.D.Cal. Mar. 22, 2012). Prior to BOA's acquisition of Countrywide, Countrywide was the servicer of Mr. Murphy's Mortgage. Countrywide also purported to be the lender with respect to Mr. Murphy's Mortgage, but was not.

11.  Non-party Countrywide Home Loans Servicing, LP changed its name to BAC Home Loans Servicing, LP and was merged into BOA in 2011.

12.  Non-party Mortgage Electronic Registration System ("MERS") is a mortgage electronic registration system, and a company sponsored and instituted by mortgage companies. MERS was the nominee-mortgagee for Countrywide, and Countrywide's successors and assigns. As nominee-mortgagee, it claimed authority to act on behalf of the mortgagee.

## FACTUAL BACKGROUND

### A. *Mr. Murphy's Financing of His Home and the Two Purported Assignments of His Mortgage*

13.  In May 2006, Mr. Murphy purchased his home, located at 85 Short Street, Blairsville, Pennsylvania. In connection with the purchase, Mr. Murphy financed the principal amount of $53,200.00 from Countrywide and granted a Mortgage (the "Mortgage") to Countrywide and MERS, as nominee for Countrywide. The Mortgage was recorded in the Office of the Recorder of Indiana County in Mortgage Book 1650, Page 700. A copy of the Mortgage is attached hereto

as Exhibit A. A copy of Mr. Murphy's Note at the time of his closing is attached hereto as

Exhibit B. The Note, as it now exists, and who is eligible to enforce it is currently unknown by

Mr. Murphy.

14.  The Mortgage authorizes Countrywide to sell the Note and Mortgage, and authorizes a

separate transfer of the servicing rights.[3]  Mortgage, ¶ 20, which, inter alia, provides:

> **Sale of Note; Change of Loan Servicer; Notice of Grievance**.
> The Note or a partial interest in the Note (together with this
> Security Instrument) can be sold one or more times without prior
> notice to Borrower. A sale might result in a change in the entity
> (known as the "Loan Servicer") that collects Periodic Payments
> due under the Note and this Security Instrument and performs
> other mortgage loan servicing obligations under the Note, this
> Security Instrument, and Applicable Law. There also might be one
> or more changes of the Loan Servicer unrelated to a sale of the
> Note.

15.  Where, as here, the servicing right terms of the Mortgage are retained by the

mortgagee, the sale of the mortgage or note is known as being completed on a "servicing-

retained" basis.

16.  Soon after closing, Countrywide packaged Mr. Murphy's Note with a larger pool of

notes, which were then transferred on a servicing-retained basis to Bank of New York

(predecessor of Defendant, BNY Mellon), as Trustee for the Certificateholders of the CWABS,

Inc. Asset-Backed Certificates, Series 2006-11.

17.  Through an Assignment of Mortgage with a purported effective date of September 26,

---

[3] "Servicing" means:

> receiving any scheduled periodic payments from a borrower pursuant to
> the terms of any federally related mortgage loan, including amounts for
> escrow accounts under section 10 of RESPA (12 U.S.C. § 2609), and
> making the payments to the owner of the loan or other third parties of
> principal and interest and such other payments with respect to the
> amounts received from the borrower as may be required pursuant to the
> terms of the mortgage servicing loan documents or servicing contract.

See 12 C.F.R. § 1024.2.

2007, MERS purported to assign its nominee interest in the Mortgage to BNY Mellon as Trustee for the Certificateholders of the CWABS, Inc. Asset-Backed Certificates, Series 2006-11. The Assignment was backdated because BNY Mellon had previously filed a foreclosure action on September 28, 2007. Despite reflecting a purported effective date of September 26, 2007, the signature of the officer of MERS who executed the Assignment is dated October 9, 2007, and the Assignment was not filed with the Office of the Recorder of Indiana County until October 19, 2007. See Exhibit C, attached hereto. The 2007 Assignment was signed on behalf of MERS by M. Kelly Richie, who identified himself as a "1st Vice President" of MERS.

18. Despite the fact that it supposedly had assigned the Mortgage to BNY Mellon in 2007, MERS, as nominee, purported to again assign the Mortgage to BNY Mellon in February 2012. This second Assignment was valid, unlike the first. The 2012 Assignment was filed with the Office of the Recorder of Indiana County on March 8, 2012. See Exhibit D, attached hereto. MERS did not obtain court authorization to replace its first Assignment to BNY Mellon with this one.

19. The second Assignment also purported to assign Mr. Murphy's Note to BNY Mellon. This second Assignment was the first known assignment and transfer of the Note from Countrywide to BNY Mellon. Countrywide, however, no longer existed at the time of the purported second Assignment and, therefore, any assignment by or for it was invalid. This is because, at the time of this Assignment, MERS could have not have been acting as nominee for Countrywide.

### B. Relevant Mortgage Terms Restricting Foreclosure-Related Attorneys' Fees

20. Neither law firm MWC nor servicer BOA was authorized under the Mortgage contract to charge and/or collect liquidated or flat foreclosure-related attorneys' fees. See Exhibit A, ¶¶ 9, 14 and 22.

21.   Mr. Murphy's Mortgage restricts charging for attorneys' fees and costs by at least four preconditions: a fee/cost disbursement (¶9), the legal services being performed (¶14), the servicer and lender actually incurred the obligation to pay the performed and incurred charges (¶22), and, the reasonable fees must be unilaterally determined by a court.

22.   Mr. Murphy's Mortgage, ¶9, authorizes that "[a]ny amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment."

23.   Mr. Murphy's Mortgage contract authorizes, <u>inter alia</u>, that the lender may not charge foreclosure-related attorneys' fees except for services actually performed as explicitly authorized below, and in accordance with applicable state law:

> Lender may charge Borrower fees **for services performed** in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorney's fees... **Lender may not charge fees that are expressly prohibited by** this Security Instrument or by **Applicable Law**. (Emphasis added)

<u>See</u> Exhibit B, ¶14.

24.   This Mortgage also authorizes that, <u>inter alia</u>, in instances of default, the lender may only charge the Homeowners for attorneys' fees for services actually incurred in connection with that default, and that are in accordance with applicable state law.   Exhibit B, ¶22, which provides: "Lender shall be entitled to collect all **expenses incurred** in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by **Applicable Law**," (Emphasis added).

25.   The foreclosure-related attorneys' fees and costs itemized in the Foreclosure Complaint were not for services performed or incurred in the amounts demanded in the foreclosure

complaints at the time of filing and, therefore, were not authorized by the Mortgage because they were only anticipated or estimated attorneys' fees. Yet, those fees (in part estimated and anticipated) were charged to and liened against Mr. Murphy's and Homeowners' properties. Accordingly, these foreclosure attorneys' fees amounted to charging fees for legal services not yet performed or incurred. The evidence of this fact is in the exclusive possession, custody and control of the Defendants.

26.   Neither BNY Mellon nor BOA was contractually authorized to charge and/or collect foreclosure-related attorneys' fees before the fee was actually incurred or before MWC performed such legal services. Mortgage, ¶ 14, 22, quoted above.

27.   Neither BNY Mellon nor BOA was contractually authorized to charge and/or collect foreclosure-related attorneys' fees that were not reasonable as determined by the method in the Mortgage contract, i.e., fees charged on a percentage or fixed fee basis (instead of an hourly rate method) are not contractually authorized. Exhibit A, ¶ 9.

28.   It is believed, and therefore averred, that MWC charges a flat-fee for the entire foreclosure process before services are actually performed. It is further averred that MWC only incurs portions of these fees as a Foreclosure Complaint works through certain Foreclosure milestones (i.e., a portion incurred at filing, judgment, etc.). Defendants omitted that the fees had not been fully incurred for services performed as they pursued them. This made it more difficult for Mr. Murphy and Homeowners to cure their defaults and save their homes.

29.   The specific details of MWC's fee agreements are exclusively in the custody and control of Defendants. However, regardless of the structure of when the fee is incurred, it is believed work is charged to the Homeowners before the services are actually performed in violation of the Mortgage. See Mortgage, ¶ 14.

30.   It is further believed, and therefore averred, that MWC does not keep any individual attorney time records related to services performed on foreclosure work.

31.   Because the attorneys' fees and foreclosure-related expenses charged to Mr. Murphy and other Homeowners were not authorized by the mortgages and/or were illegal under statutory law at the time they were charged, Mr. Murphy and other Homeowners were paying and/or being assessed charges on inflated principal balances or on their debt. These fees and costs resulted in inflated liens placed on Mr. Murphy's and Homeowners' properties. These fees and costs resulted in some Homeowners paying and/or being assessed interest, for example, if consolidated in a loan modification agreement.

32.   The foreclosure-related attorneys' fee provisions cited above are standard terms found in most residential mortgages.   In addition, Defendants' charging and collection practices relating to foreclosure-related attorneys' fees and costs are also standard. This standardization includes the preparation of individual foreclosure complaints.

### C. BNY Mellon's Foreclosure Actions

#### a.   The First Foreclosure Complaint

33.   Servicers almost always retain foreclosure debt collecting counsel on behalf of the foreclosing lender and BOA retained MWC to file the foreclosure complaints against Mr. Murphy on behalf of BNY Mellon.  It is believed, and therefore averred, that there are written retainer agreements between BOA and MWC that are in BOA's and/or MWC's exclusive possession, custody and control.

34.   On September 28, 2007, BNY Mellon, through its agent and debt collector MWC, filed its First Foreclosure Complaint against Mr. Murphy, alleging that Mr. Murphy was in default under his loan and that a total of $59,536.46 was due and payable to BNY Mellon.  Of this amount, the principal balance that was owed was alleged to be $53,062.59; the remaining

balance of approximately $6,500 consisted of interest ($2,842.98) and attorneys' fees ($2,653.13), as well as other fee and charges, including for late charges, corporate advance, escrow advance and title search. This first foreclosure action was docketed in the Court of Common Pleas of Indiana County at No. 11805 CD 2007. The First Foreclosure Complaint purported to be verified by Shannon Nicole Varner, identified as an Assistant Vice President of BOA. See Exhibit E, attached hereto. At this time, BOA was Mr. Murphy's servicer.

35. The First Foreclosure Complaint filed by BNY Mellon falsely alleged that the Mortgage had been assigned by MERS to BNY Mellon, and that the Assignment would be recorded in the Indiana County Office of the Recorder. The Assignment was later filed on October 19, 2007. See ¶17, supra.

36. The First Foreclosure Complaint filed failed to plead the date(s) on which the demanded amounts (see ¶34, supra) became due and owing.

37. On November 9, 2007, BNY Mellon through its agent, Defendant MWC, caused a default judgment to be entered against Mr. Murphy in the amount of $60,387.42, plus costs and interest. This amount consisted of the charges described in ¶34, supra, as well as $850.96 of additional interest that allegedly had accrued during the period from September 26, 2007 to November 8, 2007. BNY Mellon and debt collector MWC caused a Writ of Execution to be issued with respect to the default judgment on or about November 16, 2007, and proceeded to schedule a Sheriff's sale with respect to Mr. Murphy's home.

b. The Act 91 Notice Sent to Mr. Murphy was Defective

38. On or about November 4, 2008, after the First Foreclosure Complaint was filed, Countrywide Servicing sent Mr. Murphy a document that purported to be an Act 91 Notice, i.e., a notice that is required to be sent by certified and regular mail as a prerequisite to foreclosure by

the Housing Finance Agency Law ("Act 91"), 35 P.S. § 1680.403c.  See Exhibit F, attached hereto.  The Notice falsely identified Countrywide Servicing as both the lender and servicer of Mr. Murphy's loan.  The Notice further represented that as of the date of the Notice there was a past due amount of $3,566.05 owed to Countrywide Servicing.

39.   No further notices purporting to be notices under Act 91 were sent to Mr. Murphy, and at no point did BNY Mellon send a true Act 91 notice to Mr. Murphy.  Under the terms of Act 91, §1680.403c, prior to the commencement of a foreclosure, mortgage holders are required to send Homeowners a notice that satisfies the specific statutory requirements as a prerequisite to initiating any foreclosure action.

40.   These statutory notification requirements at all relevant times included, inter alia, requirements that the homeowner receive an accurate, itemized breakdown of the total amount past due as of the date of the notice; that the homeowner be informed that he/she is entitled to thirty-three (33) days to have a face-to-face meeting with a consumer credit counseling agency; and that the homeowner be made aware she can apply for financial assistance under the state-funded Homeowner's Emergency Mortgage Assistance Program ("HEMAP").

41.   The notice that Countrywide Servicing sent to Mr. Murphy in November 2008, failed to satisfy the Act 91 requirements in several relevant respects.

a.  First, an Act 91 notice, to be valid, must provide an accurate default amount due as of the date of mailing so as to enable the homeowner to make good on the pre-acceleration default.  The notice sent misrepresented the outstanding amount due and owing.

b.  Second, the notice failed to accurately state, and misrepresented, the number of months for which Mr. Murphy's payments were in arrears.  The Notice recited that "YOU HAVE NOT MADE MONTHLY MORTGAGE PAYMENTS for the following months and

the following amounts are now past due," but then referred only to "8/1/2008" as the only date for which "Monthly Charges" allegedly were owed.

c.   Third, the purported Act 91 notice misrepresented the amount of time Mr. Murphy had to request a meeting with a consumer credit counseling agency.  Countrywide Servicing informed Mr. Murphy that he had thirty (30) days to meet with a credit counseling agency, as opposed to the thirty-three (33) days to which he was entitled by statute.   35 P.S. § 1680.403c.

d.   Fourth, Countrywide Servicing also threatened to initiate legal action if Mr. Murphy did not pay the amount claimed to be owed within thirty days.  As noted, no legal action may be initiated unless and until (1) the mortgagee sends the homeowner a notice meeting the statutory requirements of Act 91, and (2) at least thirty-three (33) days pass without the homeowner applying for financial assistance from HEMAP.  If a homeowner does apply for assistance through HEMAP, the lender is not permitted to initiate any legal action for an even longer period to allow for the application for assistance to be processed.

42.   Because Countrywide Servicing did not send Mr. Murphy a notice complying with the provisions of Act 91, its threat to initiate a foreclosure action could not lawfully have been taken.

c.   The Second Foreclosure Complaint

43.   On April 16, 2012, BNY Mellon, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-11, filed a Complaint in mortgage foreclosure (the "Second Foreclosure Complaint") against Mr. Murphy in Indiana County, Pennsylvania through its agent and debt collector, MWC.  See Exhibit G, attached hereto.  The Second Foreclosure Complaint is docketed at Case No. 10664 CD 2012.

44.   The Second Foreclosure Complaint filed on behalf of BNY Mellon was verified by

Shannon Nicole Varner, Assistant Vice-President of defendant BOA.

45. The Second Foreclosure Complaint demanded a total of $102,157.77, itemized as follows (without identifying the date on which these amounts allegedly were due):

| | |
|---|---|
| Unpaid Principal Balance | $65,014.83 |
| Accumulated Interest (7/1/08 – 2/27/12 | 31,183.48 |
| Accumulated Late Charges | 149.16 |
| Attorney's Fee | 1,450.00 |
| Corporate Advance | 675.00 |
| Escrow Advance | 3,685.00 |
| Total | $102,157.77 |

46. The Second Foreclosure Complaint failed to provide any support that the demanded expenses and fees were incurred for services performed. As of April 16, 2012, BNY Mellon had not incurred foreclosure-related attorneys' fees, as charged to Mr. Murphy, for the legal services allegedly charged and, therefore, the attorneys' fees were not due or owing as of April 16, 2012.

47. With respect to attorneys' fees, 41 P.S. § 406 ("Act 6") limits the attorneys' fees that can be charged to residential mortgage debtors to fees that are "reasonable and actually incurred."[4]  In addition, attorneys' fees and legal expenses prior to the commencement of a foreclosure complaint may not exceed $50. 41 P.S. § 406(3). Despite these express statutory prohibitions, the complaint demanded a flat amount of $1,450.00 in attorneys' fees. Not only is this sum not alleged to reflect work MWC performed, but it is believed, and therefore averred, that BNY Mellon never paid such alleged fees before they were charged to Mr. Murphy.

48. The attorneys' fees demanded in the Second Foreclosure Complaint were not based on legal services incurred and invoiced by MWC or that BNY Mellon or BOA actually incurred for

---

[4] Prior to September 8, 2008, Act 6 applied to residential mortgages with an amount of $50,000.00 or less. Thereafter, it was amended to cover mortgages with a base figure of up to $217,873.00, as adjusted annually by the Department of Banking. See Act 6, §101 (defining "residential mortgage" and "base figure"). Mr. Murphy contends that Act 6 applies prospectively to foreclosure proceedings and, therefore, a mortgage that originated before September 8, 2008 in an amount over the $50,000.00 residential mortgage amount, but under the base figure of $217,873.00, would be subject to 2008 amendment.

services performed as of April 16, 2012, the date the Second Foreclosure Complaint was filed.

49.    The Second Foreclosure Complaint demanded attorneys' fees from Mr. Murphy that were misleading and/or deceptive because the amounts not for services performed and were unincurred.  The lien resulting from this Complaint wrongfully caused a diminution in the value of Mr. Murphy's home.  Mr. Murphy has suffered deprivation of property equal to the inflated attorneys' fees liened against, and encumbering, Mr. Murphy's home.

50.    Mr. Murphy's current account balance (payoff amount) was overstated upon the filing of the Second Foreclosure Complaint.    Currently, it reflects paid (or liened) and unpaid foreclosure-related fees and legal expenses.

### D.  A Prothonotary in Pennsylvania Lacks Judicial Power to Enter Judgment on an Unliquidated Award

51.    MWC, BNY Mellon and BOA also charged, collected and/or liened foreclosure-related attorneys' fees, in fixed amounts not yet incurred, from Mr. Murphy and Homeowners after the entry of the final foreclosure judgment that consisted of unliquidated, as opposed to liquidated, amounts.  Mr. Murphy did not personally pay any foreclosure-related attorneys' fees or costs, which were charged or liened on his home.

52. A Prothonotary in Pennsylvania lacks the judicial power to enter a monetary judgment for unliquidated damages absent express direction from an Article V court.  The Prothonotary is only empowered to enter a default judgment for liquidated damages of a "sum certain or which can be made certain by computation…"  See Pa.R.Civ.P. 1037 (b)(1).

53. It is a violation of state law to claim a specific amount when demanding relief for unliquidated damages: "(b) Any pleading demanding relief for unliquidated damages shall not claim any specific sum."  See Pa.R.Civ.P. Rule 1021(b).  Such unliquidated amounts cannot be determined by the Prothonotary, as explained infra.  See Pa.R.Civ.P. 1037(b)(1), which provides:

> The prothonotary shall assess damages for the amount to which the plaintiff is entitled if it is a sum certain or which can be made certain by computation, but if it is not, the damages shall be assessed at a trial at which the issues shall be limited to the amount of the damages.

54. In the body of the Second Foreclosure Complaint, Mr. Murphy was demanded to pay a specific sum that included $156,512.50 plus interest; part of which consisted of unliquidated attorneys' fees. This amount included the illegal foreclosure-related attorneys' fees and costs.

## CLASS ALLEGATIONS

55. This Fed.R.Civ.P. 23(b)(3) class consists of Mr. Murphy and former or current Homeowners who obtained financing secured by a first mortgage on residential property located within the Commonwealth of Pennsylvania, where MWC caused a foreclosure complaint to be filed against such Homeowners, and where BOA was a servicer or where BNY Mellon was the lender/mortgagee for all or part of the time period within six years prior to the filing of the initial Complaint.

### A. Numerosity

56. The class is so numerous that it is impracticable to bring all members thereof before the Court. The exact number of Homeowners is unknown, but is believed to be over 5,000. The exact number can be determined from Defendants' records.

### B. Commonality and Predominance

57. There are questions of law and fact common to the class and which predominate over any issues affecting only individual class members. See Fed.R.Civ.P. 23(b)(3). Without limitation, the focus of the litigation will be MWC's uniform demand for foreclosure-related attorneys' fees and collection procedures before services were performed and before they were incurred. It is also argued that Defendants' practices violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c); the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. §1692, et seq.; the Pennsylvania Loan Interest and Protection Law ("Act 6"), 41 P.S. §101, et seq.; and the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §201-1, et seq.

58.   The common questions of fact and law that predominate include:

a.   Did MWC's billing practices constitute a scheme or artifice to defraud under RICO, §1962(c)?

b.   Did MWC plan and execute the schemes under RICO, §1962(c)?

c.   Did MWC's involvement rise to the level of "conducting or participating in the affairs of" the enterprise within the meaning of RICO, §1962(c)?

d.   Did MWC misrepresent the character, amount or the legal status of any debt? [FDCPA, §1692e(2)(A)]

e.   Did MWC misrepresent the attorneys' fees which may be received for the collection of a debt?  [FDCPA, §1692e(1)(A) and §1692e(2)(B)]

f.   Did MWC use unfair means to collect or attempt to collect debts because the debts were not expressly authorized by the mortgage?  [FDCPA, §1692f(1)]

g.   Did MWC use unfair means to collect or attempt to collect debts because it was not permitted by Pennsylvania law? [FDCPA, §1692f(1)]

h.   Can a person lien or charge fees or costs prior to and during the 30-day notice period provided for in Act 6, §403?

i.   Does the mortgage restriction limiting foreclosure fees to actually incurred fees preclude a person from charging or liening estimated and/or anticipated fees provided for in Act 6, §406?

j.   Does the mortgage restriction limiting foreclosure fees to actually incurred fees

preclude charging or liening flat fees and/or percentage fees provided for in Act 6, §406?

k. Can the mortgagor who was overcharged and/or overpaid, and economically injured, assert a viable claim under Act 6, §502?

l. Can the mortgagor who was overliened, and economically injured, assert a viable claim under Act 6, §502?

m. With respect to economic injury, is a payment in property-in-kind (like a lien) the functional equivalent of payment in cash under Act 6, §502?

n. Did BOA deceptively misrepresent the characteristics and/or benefits of mortgages insofar as the charges and liens that it imposed upon the property under the UTPCPL, §201-9.2?

o. Was BOA's conduct deceptive with respect to its charging, collection, and/or liening of foreclosure-related fees and costs under the UTPCPL?

p. In post-execution of contract deprivations of the bargain, where the injured person is passive, is justifiable reliance a causation requirement under the UTPCPL?

q. Is justifiable reliance an element of deception in the execution of a mortgage contract under the UTPCPL?

r. Can a payment by property in kind (i.e., a temporary lien) constitute an ascertainable loss of property under the UTPCPL?

s. Is an ascertainable loss established by showing the fact of a loss or must the injured person be able to precisely value that loss under the UTPCPL?

t. Where a monetary value cannot be reasonably placed on the actual loss, is the injured person entitled to a statutory award of at least $100.00?

u. Do inflated charges under a residential mortgage constitute an inflated lien and

economic injury or ascertainable loss?

v.   Do the mortgage restrictions limiting foreclosure fees to services performed preclude charging and/or liening estimated and/or anticipated fees?

w.   Do the mortgage restrictions limiting foreclosure fees to services actually incurred preclude the foreclosing plaintiff from charging and/or liening estimated and/or anticipated fees?

x.   Do the mortgage restrictions limiting foreclosure fees to services performed preclude charging and/or liening flat fees and/or percentage fees?

y.   Do the mortgage restrictions limiting foreclosure fees to actually incurred fees preclude the foreclosing plaintiff from charging and/or liening flat fees and/or percentage fees?

z.   Do the mortgage restrictions limiting foreclosure fees to services performed limit the fees to actual hourly fees?

### C.  Typicality

59.   Mr. Murphy's claims are identical, or at least typical, to the claims of the class members. Mr. Murphy and the class of Homeowners he represents have sustained virtually identical types of injury, have been subjected to identical, or at least similar, illegal foreclosure-related collection attempts, and their claims are based on identical statutory legal theories and contractual violations. Actual damages, where applicable, can be mechanically and mathematically determined from business records maintained by Defendants. See Fed.R.Civ.P. 23(a)(3).

### D.  Adequacy of Representation

60.   Mr. Murphy is an adequate class representative because his interests coincide with, and are not antagonistic to, the interests of the Class. Furthermore, class counsel is competent and

experienced in such litigation. See Fed.R.Civ.P. 23(a)(4).

### E. Superiority

61.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Fed.R.Civ.P. 23(b)(3). The actual and/or statutory damages sought by Mr. Murphy and each of the class members are such that individual prosecution would prove burdensome and expensive, given the complex and extensive litigation necessitated by Defendants' foreclosure conduct. It would be virtually impossible, from a financial standpoint, for members of the class to individually redress the wrongs done to them in an economic and effective manner. Many, if not most, of the class members are unaware of their rights under their mortgage contracts and of their foreclosure rights under federal and state law. Even if the members themselves could afford such individual litigation, it could be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system given the complex legal and factual issues raised by Defendants' conduct related to foreclosures. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon the same proof in one case.

**COUNT I**

**Against BNY Mellon and BOA for Breach of Contract**

62.  The preceding paragraphs are incorporated by reference.

63.  Defendant, BNY Mellon has represented itself to be the owner of Mr. Murphy's Note and the assignee of the Mortgage securing the Note. Therefore, it is the counterparty to those contracts.

64.  In servicing the mortgages of Mr. Murphy and Homeowners, BOA undertook various

servicing duties and obligations, which included advancing funds (or credit) to Mr. Murphy and Homeowners for foreclosure-related attorneys' fees and costs, expenses and fees including advancement of attorneys' fees to, inter alia, protect the mortgagee's interest in the mortgaged properties. When BOA advanced such money or credit to Mr. Murphy and other class members, it unilaterally increased their unpaid debt by the amount advanced. As a result, BOA was not merely engaged in servicing loans for BNY Mellon, as trustee, but also was acting as, and/or holding itself out to be a lender, thereby acquiring an obligation to strictly follow the Mortgage contract and acquiring an interest in Mr. Murphy's and the Homeowners' mortgages. In the Act 91 Notice issued by Countrywide Home Loans Servicing, LP to Mr. Murphy (Exhibit F hereto), it identified itself as the lender with respect to Mr. Murphy's Mortgage. In addition, in connection with notices sent by BOA and its predecessors with respect to force-placed insurance, BOA represented that it has a protectable interest in the property securing Mr. Murphy's mortgage and the Additional Named Insured Certificate issued by QBE Insurance identified BOA as the "NAMED INSURED MORTGAGEE."

65.  Defendants, BNY Mellon and BOA breached their contractual obligations to Mr. Murphy and the class by charging and/or collecting foreclosure fees and costs in violation of the terms of the standardized mortgage contracts into which it entered with Mr. Murphy and members of the class.

66.  Mr. Murphy's Mortgage contract provides that the lender "may not charge fees that are expressly prohibited… by Applicable Law." Exhibit A, ¶ 14. This would apply to the services, as well, where a note or mortgage is sold on a servicing-retained basis. The Mortgage further specifies that, in instances of a borrower's default, the lender may only charge fees for services *performed* in connection with that default. Id. Finally, in the context of attorneys' fees and

related costs, the Mortgage only authorizes the lender to collect "expenses *incurred*."  Id., ¶ 22 (emphasis added).  These provisions are standard terms found in most, if not all, residential mortgages.

67.  BNY Mellon and BOA violated all of these provisions by charging and/or collecting foreclosure fees and costs that violated Act 6.  Act 6 only permits a mortgagee to collect "reasonable" and "actually incurred" legal fees as awarded by a court.  41 P.S. § 406(2).  Prior to the commencement of a foreclosure action, these "reasonable" fees that were "actually incurred" are capped at $50.  41 P.S. § 406(3).

68.  BNY Mellon and BOA exceeded Act 6's statutory cap and violated Act 6's requirement that fees be actually incurred when they attempted to impose a flat attorney's fee of $1,145.00.  These actions thereby amounted to charging fees "expressly prohibited" by law, in violation of Mr. Murphy's standard Mortgage contract.  These actions also amounted to charging fees for legal services not performed, in contrast to the Mortgage contract's explicit language requiring that any fees be for services actually performed.

69.  Mr. Murphy and the Homeowners have suffered actual and/or nominal damages as a result of Defendants breaches of contract, including, inter alia, being charged, liened or paying unauthorized and/or illegal foreclosure-related fees and costs.  They paid and/or were liened some or all of these unauthorized and/or illegal charges.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the class, respectfully requests that the Court enter judgment against BNY Mellon and BOA.

## COUNT II

**Against Defendants BNY Mellon, BOA and MWC for Charging and/or Collecting Prohibited Foreclosure-Related Attorneys' Fees and Costs in Violation of Act 6**

70.    The preceding paragraphs are incorporated.

71.    At the time the Second Foreclosure Complaint was filed against Mr. Murphy, Act 6 had been amended to apply prospectively and covered mortgages valued up to $217,873.00, as adjusted annually by the Department of Banking.

72.    The Act 6 terms "costs" and "legal expenses," includes foreclosure-related fees and expenses, including, attorneys' fees, inspection fees, title search fees and BPO charges.  See Act 6, §§404 and 406(3).    Inflated liens, like overpayments, cause economic injury to the Homeowners.  These injuries result in financial damages.

73.    This Count against Defendants, BNY, BOA and MWC arises under the Act 6, 41 P.S. §101, et seq.  This Count includes, but is not limited to, members of the class with purported state judgments that were not signed by an Article V court, but by, for example, the Prothonotary or its Deputy.  This Count also includes post judgment attorneys' fees and costs entered by a Prothonotary or Deputy, unless such fees were added by the Prothonotary in the course of a merely ministerial implementation of a signed Article V court Order.  This Count excludes Homeowners who paid foreclosure-related attorneys' fees and costs as a result of a state judgment signed by a court.

74.    Act 6, §101 includes within its broad scope "persons" and "residential mortgage lenders," defined as follows:

> "Person" means an individual, corporation, business trust, estate trust, partnership or association or any other legal entity, and shall include but not be limited to residential mortgage lenders.
>               *    *    *
> "Residential mortgage lender" means any person who lends money or extends or grants credit and obtains a residential mortgage to

> assure payment of the debt. **The terms shall also include the holder at any time of a residential mortgage obligation.** (Emphasis added)

Holders of residential mortgage obligations include holders of servicing rights.

75.   Act 6, §406, with respect to the misconduct of "residential mortgage lenders" provides:

> With regard to residential mortgages, no residential mortgage lender shall contract for or receive attorney's fees from a residential mortgage debtor except as follows:
>
> \*    \*    \*
>
> (2) Upon commencement of foreclosure or other legal action with respect to a residential mortgage, attorney's fees which are **reasonable and actually incurred** by the residential mortgage lender may be charged to the residential mortgage debtor.
> (3) Prior to commencement of foreclosure or other legal action attorneys' fees **which are reasonable and actually incurred not in excess of fifty dollars ($50)** provided that no attorneys' fees may be charged for legal expenses incurred prior to or during the thirty-day notice period provided in section 403 of this act. (Emphasis added)

76.   Defendants BNY, BOA and MWC demanded attorneys' fees and legal expenses that violated §406 because they liened, charged or collected:

 a.   foreclosure-related attorneys' fees and costs (in excess of $50) allegedly incurred before the thirty-three (33) day right to cure expired and/or allegedly incurred prior to the commencement of its foreclosure action;

 b.   foreclosure-related attorneys' fees and costs before they were actually incurred and performed; and/or,

 c.   liquidated foreclosure-related fees and costs (pre and/or post foreclosure judgment) that had not been determined reasonable and awarded by a court (i.e., were determined by a Prothonotary or its Deputy).

77.   In addition, the above foreclosure-related fees and costs charged and/or collected

violated Act 6 because they were not authorized by the mortgage contracts of the members of the class.

78.   Act 6 statutory attorneys' fees constitute damages that are not liquidated because they are not fixed in an amount by the mortgage contract and they can only be determined reasonable by an Article V state court.  See Act 6, §406.  Also see Pa.R.Civ.P. Rule 1021(b) stating that "any pleading demanding relief for unliquidated damages shall not claim any specific sum," and Pa.R.Civ.P. Rule 1037(b)(1), limiting the power of a Prothonotary to entering judgments on liquidated, as opposed to un-liquidated damages.  The Prothonotary lacks the judicial power to enter a monetary judgment for un-liquidated damages absent express direction from a court. Instead, the Prothonotary is only empowered to enter a default judgment for liquidated damages of a "sum certain or which can be made certain by computation."  Pa.R.Civ.P. Rule 1037(b)(1).

79.   Defendants breached their obligations under Act 6 by liening, charging and/or collecting foreclosure-related attorneys' fees and costs that were unreasonable, because, inter alia, they were calculated on a flat-rate or percentage-of-debt basis instead of an hourly basis and without express contractual authority in the mortgages.

80.   Defendants breached their obligations under Act 6 by liening, charging and/or collecting foreclosure-related fees and costs before they were incurred for services performed or that were not incurred at all.

81.   Where a residential mortgage lender has violated §406, any §101 "person" can be liable for their conduct under the remedial provisions of §502.

82.   The unauthorized attorneys' fees and legal expenses that Defendants demanded and/or collected are recoverable under Act 6, §502.  Defendants need only be persons, whether or not they are residential mortgage lenders, to be liable under §502.  Both residential mortgage lenders

and their agent "persons" are liable under §502 for violations of §406.  Act 6 §502 states that:

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or **has paid charges prohibited or in excess of those allowed by this act or otherwise by law** may recover triple the amount of such excess interest or charges in a suit at law **against the person** who has collected such excess interest or charges. (Emphasis added)

Mr. Murphy and Homeowners have paid charges (in the form of a lien) prohibited by §406 and have brought suit "against the person who has collected such...charges."  Some Homeowners have also paid charges prohibited by §406 in the form of cash payment; Mr. Murphy is not one of these Homeowners.

83.    Where a residential mortgage lender has violated §406, any §101 "persons" can also be liable for their conduct under the remedial provisions of §504. Act 6 §504 states that:

> Any person **affected by a violation of the act** shall have the substantive right to bring an action on behalf of himself individually **for damages by reason of such conduct or violation,** together with costs including reasonable attorney's fees and such other relief to which such person may be entitled under law. (Emphasis added)

Mr. Murphy and Homeowners have been affected by the §406 violation described <u>infra</u>. Defendants need not be residential mortgage lenders to be liable under §504.

84.    Mr. Murphy and members of the class incurred and were damaged by these unauthorized foreclosure fees and costs, through their being added to the amount of liens against their property.  In addition, the class is entitled to obtain at least nominal damages.

## COUNT III

**Against Defendants BNY Mellon, BOA and MWC for Violations of Act 6 in Charging And Collecting Illegal Foreclosure Attorneys' Fees and Legal Expenses in Violation of Act 91, as Provided for in Act 6**

85.   The preceding paragraphs are incorporated.

86.   The Foreclosure Complaints filed Mr. Murphy and Homeowners are defective for one or more of the following reasons:

   a.   The mandatory Act 6 and/or Act 91 Notice was never sent;

   b.   The Act 6 and/or Act 91 Notice was not sent and/or the Foreclosure Complaint was not filed by the entity who sent the Notice and who made the acceleration decision;

   c.   The Act 6 and/or Act 91 Notice sent failed to include mandatory language informing Homeowners that they may have the right to refinance their loan, as required by Act 6;

   d.   The Act 6 and/or Act 91 Notice sent failed to include mandatory language informing Homeowners that the purpose of the face-to-face meeting with a consumer credit counseling agency was "to attempt to resolve the delinquency or default by restructuring the loan payment schedule or otherwise" as required by Act 91;

   e.   Before September 8, 2008, the Notice failed to include the mandatory language informing Homeowners that they have a right to request a face-to-face meeting with the mortgagee;

   WHEREFORE, Mr. Murphy, individually and on behalf of the members of the class, respectfully requests that judgment be entered against defendants BNY Mellon, BOA and/or MWC.

## COUNT IV

### Against Defendants BNY Mellon, BOA and MWC for Violations of the Unfair Trade Practices and Consumer Protection Law

87.   The preceding paragraphs are incorporated by reference.

88.   This Count arises under the UTPCPL, §201-9.2.  The UTPCPL prohibits the following unfair practices, "(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

89.   Defendants, BNY, BOA and MWC violated the UTPCPL by overcharging Homeowners for foreclosure-related attorneys' fees and costs, thereby misrepresenting the amount that they actually owed, and placed inflated liens on their properties.  Defendants also charged and liened Homeowners for attorneys' fees that were not authorized by the Mortgage. Defendants also charged for foreclosure-related attorneys' fees and costs not permitted by Act 6, §§404 and 406(3).

90.   Defendants, BNY, BOA and MWC violated the UTPCPL, and Homeowners suffered an ascertainable loss by either paying the misrepresented and overcharged attorneys' fees and costs in whole or in part.  Where Homeowners, like Mr. Murphy, did not make an actual monetary payment, they nevertheless suffered an ascertainable loss of property when the unauthorized attorneys' fees and costs were liened against their homes.   The liens are ascertainable and constitute the charged amount of the illegal fees against their property.  This resulted in the loss of the Homeowners' interest in their property precisely corresponding to the cost of the illegal fee charge.   Where relevant, the fact of the Homeowners' payments automatically establishes reliance on BNY, BOA and MWC's deceptions and misrepresentations.  Where the loss is in the form of a homeowner's interest in their property due to the effect of the inflated lien, Homeowners sustained damages passively and automatically and

no reliance is necessary to establish causation.

91.   Homeowners have suffered damages as a result of the deceptions, misrepresentations and overcharges made by Defendants, BNY, BOA and MWC, including, inter alia, payment of excessive unauthorized and illegal attorneys' fees and costs and by Defendants BNY, BOA and MWC unauthorized and unincurred illegal liens on their property.

WHEREFORE, Mr. Murphy, individually and on behalf of himself and the members of the class, respectfully requests that the Court enter judgment against Defendants BNY Mellon, BOA and MWC, as authorized by 73 P.S. § 201-9.2.

### COUNT V

**Against Defendant MWC for Violations of the FDCPA in Using Deceptive and Other Unlawful Misrepresentations and Means in the Collection and Attempted Collection of Debt**

92.   The preceding paragraphs are incorporated by reference.

93.   This Count is brought under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692, et seq., against Defendant MWC as a debt collector.

94. Mr. Murphy is a "consumer" as defined by §1692a(3) of the FDCPA.

95. The FDCPA prohibits, inter alia, debt collectors from using "any false, deceptive or misleading representation or means in connection with the collection of any debt," (§1692e) or any "unfair or unconscionable means to collect or attempt to collect any debt," (§1692f).

96. Defendant MWC acted as the debt collector for BNY Mellon and/or BOA in connection with the deceptive, misleading and other unlawful conduct taken with respect to the collection and attempted collection of the debt of Mr. Murphy and members of the class, including the collection and attempted collection of attorneys' fees and costs not authorized by their mortgages and/or in violation of Act 6.

97. Defendant MWC violated the above-cited sections of the FDCPA by demanding and

collecting fees and costs not authorized by the Mortgage and/or prohibited by Act 6. Such sums could only have been incurred, if at all, after the commencement of the foreclosure proceedings and only then if they are deemed to be reasonable. In addition, such amounts were not incurred for services performed.

98. It is a violation of the FDCPA to include unliquidated attorneys' fees in the body of the foreclosure complaint and/or in the request for relief. Including the unlawful attorneys' fees and costs in the body of the foreclosure complaint and/or in the request for relief caused MWC to violate §1692e of the FDCPA because the inflated amount falsely represented the "character, amount or legal status" of Mr. Murphy's debt, thereby rendering the complaint a "false, deceptive or misleading representation." FDCPA, §1692e(2)(A) and §1692e(2)(B). The inclusion of such fees and costs also violated §1692f(1), which prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt."

99. MWC violated the above provisions of the FDCPA because the foreclosure complaints they caused to be filed against Mr. Murphy and members of the class demanded fixed attorneys' fees and costs that were not contractually authorized or legal because they were not actually incurred for services performed. Nor were the fees demanded based on hourly rates, and the unliquidated fees had to be determined reasonable and awarded by a court. Thus, MWC violated the FDCPA by, inter alia, representing to Homeowners in foreclosure complaints that that they owed amounts they did not owe, including charges for unauthorized, unincurred and illegal foreclosure-related attorneys' fees and costs.

100.   Defendant, MWC also violated the FDCPA by using unfair or unconscionable means to collect debts and by charging, attempting to collect or collecting amounts that are not "expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C.

§§1692f, 1692f(1).

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the class, respectfully requests that the Court enter judgment against defendants BOA and MWC, as authorized by 15 U.S.C. § 1692k.

## COUNT VI

### Violations of RICO, 18 U.S.C. § 1962(c) – Against Defendants Terrance J. McCabe, Marc S. Weinberg and Edward D. Conway

101. The preceding paragraphs are incorporated.

102. Section 1962(c) of RICO provides that it:

> [S]hall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

103. Defendants, Terrence J. McCabe, Marc S. Weisberg, and Edward D. Conway ("MWC Partners"), violated RICO by committing mail and/or wire fraud to further BOA's unauthorized and/or illegal attorneys' fees collection schemes. The attorney-fee collection scheme involved both litigation and non-litigation conduct. Mr. Murphy and the class of Homeowners were damaged as a result.

104. MWC Partners are "persons" as defined by RICO, §1961(3). MWC Partners violated RICO, §1962(c) by the unauthorized and/or illegal foreclosure acts incorporated.

105. MWC is an "enterprise" as defined by RICO, §1961(4). As an Enterprise, MWC has engaged in, and its foreclosure activities have affected, interstate commerce.

106. MWC Partners' attorney-fee collection scheme involved both litigation and non-litigation conduct. The scheme allowed MWC Partners to pursue fees through non-litigation pre-foreclosure notices, demanding illegal attorneys fees. Where those demands were unsuccessful,

Defendants would continue to pursue the illegal fees through foreclosure.

107. The MWC Partners are associated with or employed by MWC to file foreclosure complaints, wherein unauthorized and unincurred attorneys' fees for services not performed were demanded. MWC Partners knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the illegal attorney fee activities of MWC through a pattern of racketeering activity within the meaning of RICO, §§1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by MWC's reliance on MWC Partners' debt collecting activities for BNY Mellon and other lenders. The MWC Partners had the specific intent to engage in the substantive RICO conduct as alleged.

108. It is believed, and therefore averred, that the MWC Partners do not keep time records for their foreclosure activities and earn fees from their servicer based on milestones in litigation while charging Homeowners the entire fee at the outset of litigation was also intentional and/or reckless conduct. Defendants omitted the true nature of the fees from Mr. Murphy and Homeowners.

109. The MWC Partners made a number of unauthorized and/or illegal foreclosure-related attorneys' fees attempts and communicated with the MWC Enterprise by mail and/or wire (i.e., electronically) as well as through the U.S. mails in furtherance of MWC's foreclosure overcharging and collection scheme. MWC's Partners would have been unable to carry out its illegal attorneys' fees collection schemes unless it used the U.S. mails or interstate wires which constitute predicate acts of racketeering activity indictable under 18 U.S.C. §1961(1)(B).

110. Operating through the MWC enterprise, the MWC Partners developed and implemented policies and procedures as an instrumentality to carry out the unauthorized and/or illegal attorneys' fees collection schemes. These policies and procedures include filing

foreclosure complaints that contained demands for attorneys' fees and costs that were unauthorized and/or illegal.

111.    The wrongful foreclosure-related attorneys' fees and costs charged, liened and/or collected from Homeowners resulted in economic benefits to the MWC Partners, as well as the MWC enterprise.  MWC, as the foreclosure firm charged unauthorized and/or illegal attorneys' fees and costs based on the MWC Partners', and other partners' and associates', fixed fee demands.  The MWC Partners, as foreclosure counsel, attempted to collect foreclosure-related fees through MWC from Mr. Murphy and Homeowners that were in excess of those authorized by the mortgages and/or permitted by state law.  The MWC Partners use of the U.S. mails or interstate wires to carry out MWC's schemes economically injured Mr. Murphy and the class members.

112. The MWC Partners' foreclosure-related racketeering acts were not isolated, but were related in that they had the same or similar purpose and result, participants, and foreclosure-related methods of commission.  Further, MWC Partners' racketeering acts were ongoing and continuous for the ten-year period preceding this lawsuit.

113. The MWC Enterprise was not limited to the predicate acts and extended beyond its racketeering activities to legitimate activities outside of the attorney fee scheme procedure.  It existed separate and apart from the pattern of its racketeering activities for the legitimate business purpose of providing legal services.  MWC's Partners also have, and still engage in, legitimate business outside of its pattern of racketeering activities.

114. MWC's Partners participated in the acts of MWC through the multiple acts of racketeering as described in this Amended Complaint.  The MWC Partners committed acts constituting indictable offenses under 18 U.S.C §§1341 and 1343 in that they devised or intended

to devise schemes to collect unauthorized and/or illegal attorneys' fees from Mr. Murphy and Homeowners. For the purpose of executing its schemes, the MWC Partners caused documents to be delivered by the U.S. mails or received such therefrom. The MWC Partners also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, including defective Act 6/Act 91 notices. The acts of the MWC Partners set forth above were done with the knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the MWC Partners' wrongful schemes and participate in MWC's wrongful attorney fee collection schemes.

115. The MWC Partners' violations of state and federal law, as set forth in this Amended Complaint, each of which directly and proximately economically injured Mr. Murphy, constituted a continuous course of conduct beginning within the ten (10) years preceding the date on which this Amended Complaint is filed and continuing through the present. These violations, including charging and collecting unauthorized and illegal attorneys' fees, which were part of a pattern of racketeering activity under RICO, §§1961(1) and (5).

116. The MWC Partners have conducted and/or participated, directly or indirectly, in the conduct of the servicing affairs of the MWC Enterprise through a pattern of racketeering activity as described herein in violation of RICO, §1962(c).

117. The unlawful actions of the MWC Partners have directly, illegally, and proximately caused and continue to cause economic injuries to Mr. Murphy and Homeowners in the form of a lien and/or actual and nominal damages. Mr. Murphy seeks an award of statutory and actual damages for the economic injury created by the MWC Partners' series of unauthorized and

illegal foreclosure-related attorneys' fees, costs and liens.

WHEREFORE, Mr. Murphy, on behalf of himself and the members of the class, respectfully requests that judgment be entered against each of the MWC Partners for a statutory award of triple actual damages, costs and attorneys' fees, as authorized by 18 U.S.C. § 1964(c).

## REQUEST FOR RELIEF

Mr. Murphy, on behalf of himself and members of the class, respectfully requests the following relief against Defendants:

(1)   Under Counts I, an award actual or nominal damages and costs of suit against Defendants, BNY Mellon and BOA;

(2)   Under Counts II and III, an award of statutory damages, attorneys' fees and costs as authorized by Act 6, 41 P.S. §502 and set-offs computed at triple the excess charges paid against Defendants, BNY Mellon, BOA and MWC, and an award of statutory attorneys' fees under 41 P.S. §504;

(3)   Under Count IV, an award of actual, nominal and, where applicable treble damages, as well as reasonable attorneys' fees and costs as authorized by the UTPCPL, 73 P.S. §201-9.2, against Defendants, BNY Mellon, BOA and MWC;

(4)   Under Count V, an award of statutory damages and reasonable attorneys' fees, costs, and expenses, as authorized by RICO, 15 U.S.C. § 1692k, against ,Defendant MWC;

(5)   Under Count VI, a statutory award of triple actual damages, costs and attorneys' fees, as authorized by RICO, 18 U.S.C. § 1964(c), against Defendants, Terrance J. McCabe, Marc S. Weisberg, Edward D. Conway; and,

(6)   Such other relief as the Court deems just, proper and/or equitable.

[SIGNATURE LINES ON NEXT PAGE]

Respectfully Submitted,
MICHAEL P. MALAKOFF, P.C.

Michael P. Malakoff, Esquire
Pennsylvania Attorney I.D. #11048
Jonathan R. Burns, Esquire
Pennsylvania Attorney I.D. #315206
Suite 200, The Frick Building
Pittsburgh, PA 15219
Telephone: (412) 281-4217
Facsimile:  (412) 281-3262
malakoff@mpmalakoff.com
jburns@mpmalakoff.com

Seth Lesser, Esquire
KLAFTER OLSEN & LESSER, LLP
Two International Drive, Suite 350
Rye Brooke, NY 10573
Telephone: 914-934-9200
Facsimile: 914-934-9220
seth@klafterolsen.com
*Attorneys for Brian D. Murphy, individually and on behalf of other similarly situated current and former homeowners in Pennsylvania*

**JURY TRIAL DEMANDED**

**CERTIFICATE OF SERVICE**

I hereby certify that on the **20th** day of **January**, **2015**, a true and correct copy of the foregoing **Amended Complaint** was served upon the following parties of interest via electronic mail and the Court's Electronic Filing System:

Jeffrey B. McCarron, Esquire
Nicole Graham, Esquire
SWARTZ CAMPBELL, LLC
50 S. 16th Street, 28th Floor
Philadelphia, PA 19102
jmccarron@swartzcampbell.com
ngraham@swartzcampbell.com

Andrew J. Soven, Esquire
Marc A. Goldich, Esquire
REED SMITH, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103
asoven@reedsmith.com
mgoldich@reedsmith.com


Michael P. Malakoff, Esquire

Prepared By:
JILL BREWER
COUNTRYWIDE HOME LOANS, INC.

2380 PERFORMANCE DRIVE
RICHARDSON
TX 75082

Phone: (800)745-8644
After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Parcel Number:

Premises:
85 Short St
Blairsville
PA 15717-1425

--------------------- [Space Above This Line For Recording Data] ---------------------

00013479102705006
[Doc ID #]

# MORTGAGE

**PENNSYLVANIA** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 17

 -6A(PA) (0506)   CHL (10/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291   Form 3039  1/01



Exhibit A

DOC ID #: 00013479102705006
MIN 1000157-0006069842-6

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated MAY 25, 2006                                  , together with all Riders to this document.

(B) "**Borrower**" is

BRIAN MURPHY

Borrower is the mortgagor under this Security Instrument.

(C) "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "**Lender**" is

COUNTRYWIDE HOME LOANS, INC.

Lender is a
CORPORATION

organized and existing under the laws of NEW YORK

Lender's address is
4500 Park Granada MSN# SVB-314
Calabasas, CA 91302-1613

(E) "**Note**" means the promissory note signed by Borrower and dated  MAY 25, 2006

The Note states that Borrower owes Lender
FIFTY THREE THOUSAND TWO HUNDRED and 00/100

Dollars (U.S. $ 53,200.00                   ) plus interest. Borrower has promised to pay this debt in regular



Exhibit A

DOC ID #: 00013479102705006

Periodic Payments and to pay the debt in full not later than JUNE 01, 2036                                    .

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Exhibit A

DOC ID #: 00013479102705006

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

COUNTY                          of                          INDIANA                          :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

85 Short St, Blairsville                          ,

[Street/City]

Pennsylvania 15717-1425 ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

VMP -6A(PA) (0508)        CHL (10/05)                Page 4 of 17                        Form 3039 1/01

Exhibit A

DOC ID #: 00013479102705006

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

Exhibit A

DOC ID #: 0001347910270506

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Exhibit A

DOC ID #: 00013479102705006

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If

Exhibit A

DOC ID #: 00013479102705006

Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is

Exhibit A

DOC ID #: 0001347910270500b

completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan

Exhibit A